**TAXATION WITH REPRESENTATION FUND**

v.

**INTERNAL REVENUE SERVICE, Appellant.**

**No. 80–1688.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 15, 1981.

Decided March 12, 1981.

Stephen Gray, Atty., Dept. of Justice, Washington, D. C., with whom M. Carr Ferguson, Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty., Michael L. Paup and Richard W. Perkins, Attys., Dept. of Justice, Washington, D. C., were on brief for appellant. Ernest J. Brown, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for appellant.

William A. Dobrovir, Washington, D. C., with whom Thomas F. Field, Washington, D. C., was on brief for appellee.

Before ROBB and EDWARDS, Circuit Judges, and PENN,* District Judge, United States District Court for the District of Columbia.

HARRY T. EDWARDS, Circuit Judge:

The issues raised by this appeal require this court's consideration for the first time whether certain records of the Internal Revenue Service ("IRS") may be withheld from public disclosure pursuant to Exemption 5 of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b)(5). Exemption 5 of the FOIA protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). While Exemption 5 has been construed generally to exempt those documents normally privileged in the civil discovery context,[1] the focus of this litigation is the "deliberative process" privilege portion of Exemption 5.

The records in dispute in this case fall under three general headings: General Counsel's Memoranda ("GCMs"), Technical Memoranda ("TMs"), and Actions on Decisions ("AODs"). After carefully considering the evidence before it, the District Court found that none of the disputed documents were covered by Exemption 5. *Taxation With Representation Fund v. Internal Revenue Service*, 485 F.Supp. 263 (D.D.C. 1980). As to the GCMs, the trial court found that these documents "contain the

reasons behind the adoption of revenue rulings, private letter rulings, and technical advice memoranda," and that they are "indexed and have important precedential value in determining future tax questions." *Id.* at 266. As to AODs, the trial court found that the documents "contain the reasons behind the acquiescence or nonacquiescence of the IRS in court decisions," and that the documents are "made available to IRS personnel and are cited and applied by IRS personnel in later AOD's, and TM's to promote the consistent application of the tax laws." *Id.* at 267. As to the TMs, the trial court found that these documents "explain the reasons behind the adoption of [a] Treasury Decision" and that "[t]hey are used by IRS personnel in determining the tax status of taxpayers." *Id.*

Given these findings, the District Court concluded that the disputed documents could not be protected from disclosure under the executive "deliberative process" privilege encompassed by Exemption 5. The court also concluded that the disputed material was "not protected by the attorney-client privilege and does not constitute protected attorney work product." *Id.* at 268. Pursuant to these conclusions, the District Court ordered the IRS to make available all existing and future GCMs, TMs and AODs, and related indices, upon request, subject to the nonapplicability of other exemptions. *See Taxation With Representation Fund v. Internal Revenue Service*, 485 F.Supp. 263 (D.D.C.1980) and Supplemental Order, *reprinted in* Joint Appendix ("J.A.") at 191. For the reasons discussed below, we affirm the judgment of the District Court with certain modifications indicated in this opinion.

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

1. Exemption 5 has been construed to protect from disclosure under FOIA materials which would be protected under the attorney-client privilege, *see Mead-Data Central, Inc. v. United States Dep't of the Air Force*, 566 F.2d 242 (D.C.Cir.1977), the attorney work-product privilege, *see NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975), and the executive "deliberative process" privi-

lege, *see Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C.Cir.1980). Exemption 5 also has been construed to encompass a qualified privilege for confidential commercial information "at least to the extent that this information is generated by the Government itself in the process leading up to awarding a contract." *Federal Open Market Committee v. Merrill*, 443 U.S. 340, 360, 99 S.Ct. 2800, 2812, 61 L.Ed.2d 587 (1979).

# I. BACKGROUND

In order to get a clear understanding of the issues at stake here, it is essential to focus on the disputed documents which are the subject of this appeal. To this end, in this section we will first describe GCMs, TMs and AODs, and explain the function and significance of each document in IRS decisionmaking processes, and then outline the procedural history of this case.

## A. *Descriptions of the Documents*

### 1. General Counsel's Memoranda (GCMs)

General Counsel's Memoranda are:

legal memorandums from the Office of Chief Counsel to the Internal Revenue Service prepared in response to a formal request for legal advice from the Assistant Commissioner (Technical). They are primarily prepared by attorneys in the Interpretative Division of the Office of Chief Counsel and usually addressed to the Office of the Assistant Commissioner (Technical) in connection with the review of proposed private letter rulings, proposed technical advice memorandums, and proposed revenue rulings (hereinafter proposed determinations) of the Service. The GCM sets forth the issues presented by whichever of these proposed determinations is under review, the conclusions reached and a brief factual summary. The body of the GCM contains a lengthy legal analysis of the substantive issues, and the recommendations and opinions of the Office of Chief Counsel. The GCM is often accompanied by a draft of the proposed determination that reflects the changes and modifications recommended in the GCM.

Affidavit of Jerome D. Sebastian, Director, Interpretative Division, Office of Chief Counsel, Internal Revenue Service, *reprinted in* J.A. at 165, 166.

Generally, GCMs are prepared in connection with approximately two percent of all proposed revenue rulings, private letter rulings, or proposed technical advice memoranda issued by the Office of Assistant Commissioner (Technical). Defendant's "State-ment of Material Facts As To Which There Is No Genuine Issue," *reprinted in* J.A. at 153, 155 [hereinafter "Defendant's Statement"]. The preparation of GCMs involves the research of appropriate statutes, regulations, revenue rulings and case law, as well as previous GCMs and briefs prepared by the Office of Chief Counsel. *Id.* While less elaborate GCMs may consist of a single, short paragraph, full scale GCMs follow a specific format—including "Issue," "Conclusion," "Facts," and "Analysis"—which is set out in written instructions to the lawyers who prepare GCMs. *Id.* at 156.

A completed GCM is forwarded to the Office of the Assistant Commissioner (Technical), who uses the memorandum to determine "what positions will be taken in the proposed revenue ruling, proposed private letter ruling, or proposed technical advice memorandum." *Id.* The Office of the Assistant Commissioner (Technical) is responsible for the issuance of IRS revenue rulings, private letter rulings, and technical advice memoranda; in handling this responsibility, the Assistant Commissioner "acts as the principal assistant to the Commissioner in providing basic principles and rules for the uniform interpretation and application of the Federal tax laws." Internal Revenue Service Manual § 1113.9, *reprinted in* Appellee's brief, Addendum. In other words, the Assistant Commissioner (Technical), is the final decisionmaker of significant agency law and policy.

If differences arise between the positions of the Office of Assistant Commissioner (Technical) and the Office of Chief Counsel, the differences "are generally reconciled on an informal basis before the adoption of the revenue ruling, private letter ruling, or technical advice memorandum in question." "Defendant's Statement," *supra*, at 156–57. After the Assistant Commissioner (Technical) makes a final decision on the substantive issue(s) posed in a revenue ruling, private letter ruling or technical advice memorandum, the GCM is modified and rewritten "to represent the position taken in the . . .

ruling." [2] The District Court's finding that "differences between the GCM and ruling are resolved before the GCM is considered complete and before it becomes available for future reference," [3] as well as our own understanding from the record and the oral arguments made by counsel as to what happens to the memoranda, support the conclusion that the entire document, body and conclusion, is rewritten to reflect the Assistant Commissioner's position.

Completed GCMs are then copied and distributed to key officials within the Internal Revenue Service, including the Office of Chief Counsel. "Defendant's Statement," *supra*, J.A. at 157. The Digest Section of the Interpretative Division, Office of Chief Counsel, also prepares 161 copies of a weekly "Library Digest Bulletin," which summarizes the GCMs that have been recently finalized. The Digest is distributed to key IRS and Office of Chief Counsel officials, to "60-some" Interpretative Division attorneys, as well as to the field offices. *Id.*; Sebastian Deposition, J.A. at 69–70. [4]

The Office of Chief Counsel retains completed GCMs, and indexes and digests the memoranda "for the purpose of an in-house research tool." "Defendant's Statement," *supra*, J.A. at 157. This is done to ensure that "there [will] be some uniformity of positions taken." Sebastian Deposition, J.A. at 75. Citations of GCMs in subsequent GCMs are noted on "citator" index

cards, along with the Code and Regulations sections cited in the GCM, "just like Shepherd's." *Id.* at 61, 63. These index cards are plugged into a "RIRA system," [5] and placed on microfilm, which is available to IRS personnel in the field offices. *Id.* at 65–66.

IRS personnel who confer or negotiate on tax liability matters with taxpayers may refer to GCMs for guidance as to the positions to take in such negotiations. During such negotiations, IRS staff members do not typically state that a particular position is required by a GCM, nor do agency personnel provide copies of GCMs to taxpayers. Answer to Interrogatory, *reprinted in* J.A. at 30. In addition, IRS personnel are instructed by section 4245.3(3) of the Internal Revenue Manual that GCMs should not be used "as precedents in the disposition of other cases but may be used as a guide with other research material in formulating a district office position on an issue." IRM § 4245.3, *reprinted in* J.A. at 169. However, GCMs are frequently cited by staff attorneys in the Office of Chief Counsel in subsequent GCMs "to insure consistency, avoid duplication of research, provide a reference source, and update earlier memorandums when a position on an issue is sustained, modified, or changed within the Office of Chief Counsel." Sebastian Affidavit, J.A. at 167. [6] GCMs are also considered

---

**2.** Deposition of Jerome D. Sebastian, *reprinted in part in* J.A. at 40, 54.

**3.** *Taxation With Representation Fund v. IRS,* 485 F.Supp. at 266.

**4.** *See also* Sebastian Deposition, J.A. at 59 (noting that the GCMs are "[v]ery much like the advance sheet you get from the CCH, or Prentice-Hall. It is an informational type thing").

**5.** While Mr. Sebastian did not "want to get too much into the RIRA system" (J.A. at 65), the description of its use by the agency suggests a parallel to computerized research systems such as LEXIS. *See* discussion of RIRA with respect to AODs, J.A. at 132.

**6.** Mr. Sebastian further described in his deposition testimony how earlier GCMs are used by staff attorneys in preparing subsequent GCMs:

MR. SEBASTIAN: He could charge out the GCM [from the Diebold file], or there may be a copying machine and he can make a copy of it and take it back to the office, along with the decision that he found and reg rules, or anything else, to use that to formulate the position on that particular case.

MR. DOBROVIR: Does he look at these GCM's along with court cases and everything else as setting the frame of reference for his discussion?

MR. SEBASTIAN: Yes. They set a frame of reference, I think. Well, I guess, too, they represent a research tool, a very valuable research tool to him, plus he has what other lawyers have said on similar subjects that have been generally approved by the division, which gives him a pretty good idea of, you know, what we have held in the past on similar issues.

MR. DOBROVIR: And he sometimes will cite an old GCM and a new GCM?

MR. SEBASTIAN: Yes; he will generally cite the GCM in his document, his answer

by attorneys in the Interpretative Division and the Litigation Division to be "of some precedent as a research item." Sebastian Deposition, J.A. at 74–75.

From 1926 until 1953, the IRS published selected GCMs in the Internal Revenue Bulletin. Although no clear reason appears in the record to explain why publication ceased,[7] the Answer to Interrogatory No. 5 does indicate that the IRS has recognized that some GCMs were "of such importance as to be of general interest . . . [because they] announce[d] a ruling or decision upon a novel question or upon a question in regard to which there exist[ed] no previously published ruling or decision." J.A. at 24.

### 2. Technical Memoranda (TMs)

Technical Memoranda are memoranda from the Commissioner of the Internal Revenue Service to the Assistant Secretary of the Treasury (Tax Policy). Bley Affidavit, *reprinted in* J.A. at 170, 171. The TMs at issue in this case are drafted by attorneys in the Legislation and Regulations Division of the Office of Chief Counsel in connection with the preparation of proposed Treasury decisions or regulations.[8] *Id.* at 171. An affidavit filed by the Director of the Legislation and Regulations Division of the Office of Chief Counsel describes TMs as follows:

> The purpose of a TM is to help decisionmakers determine whether the proposed Treasury decision . . . should be issued and what its substantive content should be. Although TMs resemble each other in function, they are not prepared according to a standard format. Generally, however, a TM summarizes or explains the proposed rules, provides background information, states the issues involved, identifies any controversial legal or policy

questions, discusses the approach taken by the draftsperson, and gives the reasons for that approach.

J.A. at 172–73.

TMs may be developed "contemporaneously with the preliminary drafts or at a later point in time, after the drafts [have] moved further along in terms of agreement between staffs." Bley Deposition, *reprinted in* J.A. at 82, 85. TMs are initially prepared to aid decisionmakers who are responsible for approving or disapproving a Treasury decision or regulation. Because a TM "may have to summarize a position that was taken in the regulation, or point out where it was taken . . . and then give the options and explain why a particular route was chosen," the TM may "tell more about the regulation than is in the regulation itself." *Id.* at 91. TMs may also refer to case law, GCMs, AODs, and other TMs as relevant precedent. *Id.* at 91, 107–08; Answers to Interrogatories, J.A. at 25–27.

Before a TM finally leaves the IRS, it is compiled into a "signature package," with a transmittal memorandum and the final form of the proposed regulation to which it pertains. *Id.* at 87–88; Bley Affidavit, J.A. at 171–72. This package is then approved by the Chief Counsel, the Assistant Commissioner (Technical) and the Commissioner, after which copies of the documents are returned to the Legislation and Regulations Division for recordskeeping. Bley Deposition, J.A. at 87–90. After the package has been approved by the Secretary of the Treasury, the proposed regulation is returned to the Legislation and Regulations Division for processing, i. e., delivery to the Federal Register for publication. *Id.* at 95. The transmittal memorandum and TM are retained at Treasury. *Id.*[9]

---

back to the Assistant Commissioner, Technical.
 MR. DOBROVIR: The same way he cites a tax court case or revenue ruling?
 MR. SEBASTIAN: Yes.
J.A. at 52–53.

**7.** *See* Interrogatory No. 4, *reprinted in* J.A. at 24.

**8.** While TMs are also prepared in connection with the notices of proposed rulemaking that precede the preliminary drafting of a Treasury Decision, the TMs at issue in this case were prepared after the notice of proposed rulemaking had been published in the Federal Register. J.A. at 171.

**9.** The Bley Deposition, J.A. at 100, indicates that the Division maintains a file of TMs for

Although there is no general distribution of TMs, the Office of Chief Counsel maintains a file of TMs pertaining to regulations that have been published in final form. Bley Deposition, J.A. at 97–98. These documents are filed consecutively by Treasury Decision ("TD") number, and can be easily located for legal research. *Id.* at 100. TMs are referred to by lawyers in the Office of the Chief Counsel and the Office of the Assistant Commissioner "in order to find out what the detailed explanation of the regulation is." *Id.* at 105. In addition, "IRS personnel who confer or negotiate on tax liability matters with taxpayers . . . may refer to TMs for a more detailed explanation of the applicable regulations;" however, IRS personnel do not openly rely on a TM to justify a particular position and they do not provide copies of TMs to taxpayers or their representatives. Answer to Interrogatory, J.A. at 31.

When asked whether TMs were a form of "legislative history," like congressional committee reports that are prepared in connection with newly enacted legislation, the Director of Legislation and Regulations Division stated that:

> Well, I would think that anybody probing in the nuts and bolts of either a statute or regulation would . . . indeed find a committee report helpful, certainly; and I think they would find a technical memorandum helpful in probing of the nuts and bolts of the reg, as well as the other material. . . .

Bley Deposition, J.A. at 115–16.

3. Actions On Decisions (AODs)

Actions on Decisions are legal memoranda prepared by attorneys in the Tax Litigation Division and directed to the Chief Counsel whenever the IRS loses a case in the Tax Court, a Federal District Court, the Court of Claims, or the United States Court of Appeals. "Defendant's Statement," *supra*, J.A. at 161. AODs

> are prepared by the attorney in the Tax Litigation Division responsible for review of the case at the same time he or she prepares a formal recommendation to the Department of Justice as to whether [the] particular case should be appealed. The AOD sets forth the issue which was decided against the Government, a brief discussion of the facts and the reasoning of the attorney behind his or her recommendations that the Commissioner either "acquiesce" or "nonacquiesce" in a decision of the Tax Court or of the federal district court. . . . Once the proposed AOD is reviewed and approved, it is sent to the Office of the Assistant Commissioner (Technical). If the Assistant Commissioner (Technical) is not in disagreement with the recommendation to "acquiesce" or "nonacquiesce," the AOD is printed and distributed.

Pigg Affidavit, *reprinted in* J.A. at 174, 175.

AODs that recommend appeal do not leave the reviewing staff attorney's desk until the Department of Justice has acted on the recommendation. Pigg Deposition, *reprinted in* J.A. at 118, 120. If there is a recommendation to acquiesce,[10] the proposed AOD is reviewed and approved by the Office of Chief Counsel and is sent on to the Assistant Commissioner (Technical):

> The Assistant Commissioner (Technical) then has ten days to agree or disagree with the AOD. In the event of disagreement, conferences will be held in order to resolve the differences. . . .[11] The final authority to "acquiesce" or "non-ac-

---

regulations that have been published in final form, but there is no indication in the record as to what is done with packages that are not approved by Treasury.

**10.** "Acquiescence" in a judicial decision means that the rule of that decision will be followed and applied by the IRS in future cases. "Nonacquiescence" means that the decision will not be followed, and the case may be appealed; however, even without appeal, nonacquies-

cence "means that we are not relying, or not following that opinion, that there is something in the opinion we disagree with." Pigg Deposition, J.A. at 123.

**11.** If there is disagreement over the AOD, "there may be conferences, and the AOD revised. If they do not disagree, the AOD then goes to Printing, and it is distributed." Pigg Deposition, J.A. at 121.

quiesce" rests with the Office of Assistant Commissioner (Technical). The AOD contains what the Office of Chief Counsel considers to be the correct interpretation of the law in a given case. There may be more or different reasoning than that contained in the AOD which caused the AOD to be approved by the Office of Assistant Commissioner (Technical). AOD's are collected and printed after approval by the Office of Assistant Commissioner (Technical). After printing, some 1,700 copies are distributed in the National Office and to personnel in the field. The purpose of the distribution is to provide a research tool and guidance to Office of Chief Counsel brief writers in the field and in the National Office. The distribution also provides guidance to IRS field personnel as to the legal positions of the Office of Chief Counsel on a given issue in the time between an adverse decision in a court case and the ultimate resolution of the issue after appeal or action on the application for certiorari. "Defendant's Statement," *supra*, J.A. 162-63 (footnote added).

The record is unclear as to whether AODs recommending appeal are also reviewed by the Assistant Commissioner (Technical). However, there is some evidence to indicate that these AODs are printed and distributed along with all other AODs. Pigg Deposition, J.A. at 134.[12]

The "bottom line" decisions of AODs are published in the *Internal Revenue Bulletin* with respect to reported decisions of the Tax Court. "Defendant's Statement," *supra*, J.A. at 161. However, the full text of an AOD is never released to the public.

AODs are maintained in both the National and field offices of the Chief Counsel, in either hard copy or microfilm form. Answers to Interrogatories, J.A. at 15–17. In both formats, AODs appear to be less elaborately schematized than the GCMs and TMs. AODs are filed and indexed chronologically, alphabetically, or randomly, with no log sheet or other mechanism to record or control access to the documents.

In Defendant's Answers to Interrogatories, *reprinted in* J.A. at 31, it is noted that:

IRS personnel who confer or negotiate on tax liability matters with taxpayers or taxpayer representatives may refer to AODs for guidance as to the positions to take in such negotiations.

IRS personnel do not state that a particular position is required or necessitated by an AOD. IRS personnel do not provide copies of AODs to taxpayers or taxpayer representatives. IRM § 4245.2 instructs IRS personnel not to use AODs as precedent in the disposition of other cases where "the Commissioner's position is not sustained and he/she has neither indicated his/her acquiescence nor issued a pronouncement or Regulation." IRS personnel are further instructed by IRM § 4245.2 to follow AODs where "the Commissioner's position is sustained or in which he/she has acquiesced or has indicated his/her acceptance in the Internal Revenue Bulletin or Service Regulations."

In his deposition, Mr. Pigg testified that the publication of AODs would not, "in [his] personal opinion," cause any harm to the IRS. Pigg Deposition, J.A. at 141. He also conceded that, at least in those cases in which no appeal is taken, the AODs would be "of great interest" to tax lawyers and the public. *Id.*

B. *Procedural History of the Case*

In July of 1977, appellee Taxation With Representation Fund ("TWRF") requested the Internal Revenue Service to permit it to inspect and copy all GCMs, AODs and TMs prepared by the Service, as well as the IRS index to those documents. Complaint, *reprinted in* J.A. at 4–7. After exhausting its administrative remedies,[13] TWRF filed suit

---

12. "[W]e may decide not to follow the law of [a] Circuit, and we need to tell the field people why we are not going to follow that Circuit." Pigg Deposition, J.A. at 134.

13. The IRS failed to grant or deny the requests and in February, 1978, TWRF appealed the *de facto* denial of its requests. Complaint, J.A. at 4, 6. Still without response from the IRS, on

in the United States District Court for the District of Columbia on December 8, 1978, seeking access to the requested documents under 5 U.S.C. § 552(a)(2) and (3) of FOIA.[14]

> In its complaint, TWRF alleged that [GCMs, AODs, and respective indices] are regularly referred to by IRS personnel and ... are followed and applied as authoritative by IRS personnel in preparing rulings and rendering decisions on other matters. [GCMs and AODs] constitute final agency opinions or statements of policy within the meaning of 5 U.S.C. § 552(a)(2), but are not published nor are the indexes thereto made public as required by subsection (a)(2). Both [GCMs and AODs] and [respective] indexes are identifiable records within the meaning of 5 U.S.C. § 552(a)(3). . . . .

and that

> IRS personnel regularly refer to TM's as authoritative explanations of the meaning of IRS' Treasury Regulations [which are applied] in the decision of various matters affecting taxpayers. TM's constitute final agency opinions or statements of policy within the meaning of 5 U.S.C. 552(a)(2), but are not published nor are the indexes thereto made public as required by subsection (a)(2). Both TM's and the indexes are identifiable records within the meaning of 5 U.S.C. § 552(a)(3).

Complaint, J.A. at 4–6. TWRF also sought to compel the IRS to disclose all GCMs, AODs and TMs prepared in the future, and

to prepare and disclose current indexes to such documents.[15] *Id.* at 6.

In its Answer, the IRS denied that any of the three categories of documents constituted final agency opinions or statements of policy within the meaning of 5 U.S.C. § 552(a)(2). Answer, *reprinted in* J.A. at 8–13. While admitting that the documents were regularly referred to by Service personnel, the IRS denied that the memoranda were followed and applied as authoritative precedent. Appellant specifically referred to Internal Revenue Manual § 4245.3, wherein IRS personnel are instructed not to use GCMs as precedent in the disposition of other cases, and averred further that "approval and acceptance of an AOD by the Commissioner does not necessarily mean acceptance and approval of any or all of the reasons assigned by the Office of Chief Counsel for its conclusions." Appellant did admit, however, that TMs "constitute a detailed explanation of the regulations" and, since the memoranda do not follow a standard format, TMs "may, for example, summarize the regulations, evaluate possible problems in interpreting the statute or prior regulations, provide background information, or explain the reasons for the approaches taken in specific provisions of the regulations."

As an affirmative defense, the IRS claimed that all of the requested memoranda and indices were exempt from disclosure pursuant to section 552(b)(5) of the FOIA, which protects

> (C) administrative staff manuals and instructions to staff that affect a member of the public;
>
> and subsection (a)(3) provides:
>
> Except with respect to the records made available under paragraphs (1) and (2) of this subsection, each agency, upon any request for records which (A) reasonably describes such records and (B) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person.

November 9, 1978, TWRF advised the IRS that unless a favorable response was received within 10 days, it (TWRF) would file suit to compel disclosure of the requested documents. *Id.*

14. 5 U.S.C. § 552(a)(2) provides in pertinent part that:

> (2) Each agency, in accordance with published rules, shall make available for public inspection and copying—
> (A) final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases;
> (B) those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register; and

15. TWRF also sought costs and attorney's fees, pursuant to § 552(a)(4)(E) of the FOIA. Complaint, J.A. at 7. The disposition of that request has not been challenged in this appeal.

inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency. *Id.* at 13.[16]

After the IRS submitted its answers to TWRF's interrogatories, along with the deposition testimony and affidavits of several IRS officials, the parties filed cross-motions for summary judgment. On January 22, 1980, the District Court granted TWRF's motion for summary judgment. *See Taxation With Representation Fund v. Internal Revenue Service,* 485 F.Supp. 263 (D.D.C.1980).

The District Court relied on several statements submitted by IRS officials—in particular, a statement that any differences between a GCM and the ruling discussed in the GCM were reconciled before the document was considered complete and made available for future reference—to conclude that GCMs "contain the reasons behind the adoption of revenue rulings, private letter rulings, and technical advice memoranda," 485 F.Supp. at 266, and are, therefore, not encompassed by Exemption 5. The District Court added:

> As the Supreme Court made clear in [*NLRB v.*] *Sears,* it is just such records that are of vital concern to the public and their release offers little chance of interfering with the decision-making process of the agency. Furthermore, GCM's are indexed and have important precedential value in determining future tax questions. Accordingly, the Court concludes that completed GCM's are not protected by the governmental privilege. *Id.*

Similarly, the District Court focused on statements made by IRS officials indicating that AODs are made available to IRS personnel and are cited and applied by IRS personnel in later AODs and TMs to promote the consistent application of the tax laws. In ruling that AODs are not exempt from disclosure under section 552(b)(5), the District Court concluded that

> AOD's contain the reasons behind the acquiescence or non-acquiescence of the IRS in court decisions. These reasons are of vital concern to the public and their release will not harm the decision-making process of the agency.

485 F.Supp. at 267.

And finally, the District Court found that TMs are "indexed, digested, and made available to IRS personnel in order to assure consistent treatment of taxpayers," 485 F.Supp. at 267, and, therefore, concluded that TMs also were not encompassed by section 552(b)(5). The court noted further that

> TM's explain the reasons behind the adoption of the Treasury Decision. They are used by IRS personnel in determining the tax status of taxpayers. Accordingly, they are not deliberative material. *Id.*

In support of these rulings, the District Court pointed out that two other court deci-

---

**16.** The IRS also claimed that portions of the disputed documents were exempt under § 552(b)(3) in conjunction with 26 U.S.C. § 6103(a), in addition to "the various exemptions set forth in the subparagraphs in 5 U.S.C. § 552(b)." Answer, *reprinted in* J.A. at 13. Section 552(b)(3) exempts matters that are

> specifically exempted from disclosure by statute (other than section 552(b) of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

26 U.S.C. § 6103(a) provides that

> Returns and return information shall be confidential, and except as authorized by this title—

> (1) no officer or employee of the United States,
> (2) no officer or employee of any state or of any local child support enforcement agency who has or had access to returns or return information under this section, and
> (3) no other person (or officer or employee thereof) who has or had access to returns or return information . . . ,
> shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise under the provisions of this section. For purposes of this subsection, the term "officer or employee" includes a former officer or employee.

sions had recently held that GCMs and TMs were not protected from mandatory disclosure by Exemption 5 in FOIA. *See Pies v. Internal Revenue Service*, 484 F.Supp. 930 (D.D.C.1979) (appeal pending, No. 79–2303, D.C.Cir.), and *Falcone v. Internal Revenue Service*, 479 F.Supp. 985 (E.D.Mich.1979) (appeal pending No. 80–1105, 6th Cir.). *See also Caspe v. United States*, 80–1 U.S.T.C. ¶ 9201 (S.D.Iowa 1980) (appeal pending, No. 80–1604, 8th Cir.).

On February 1, 1980, the IRS filed a Motion for Reconsideration of the District Court's Order, and a supporting affidavit contending that the disputed records "may contain information properly exempt under Exemptions (b)(1) through (b)(9) of the Freedom of Information Act ... [or] under Code Section 6103 as tax information concerning specific taxpayers." Motion for Reconsideration, *reprinted in* J.A. at 189, 190. On April 23, 1980, the District Court denied the appellant's motion. Order, *reprinted in* J.A. at 191. In response to the IRS' concern that the disclosure of information protected by section 6103 of the Internal Revenue Code might be compelled by the District Court's order, the court authorized the redaction of portions of documents containing tax return information protected by section 6103. In addition, the District Court supplemented its original order with a holding that the disputed documents also fall within section 552(a)(2) of FOIA, and that the IRS has a "continuing duty" to make the records and indices available.

On June 19, 1980, the IRS filed a notice of appeal from the District Court's orders. J.A. at 192.

## II. ANALYSIS OF THE RELEVANT CASE LAW

### A. *A General Definition of the Deliberative Process Privilege*

Appellee sought disclosure of the GCMs, TMs and AODs described above pursuant to sections (a)(2) and (3) of the Freedom of Information Act, 5 U.S.C. § 552(a)(2) and (3). These sections require the disclosure of records constituting final opinions or statements of policy promulgated by an agency, and any records reasonably described upon request, subject to the nine specific exemptions contained in section (b) of the Act.[17] Appellant denied that the documents constitute final opinions or statements of agency policy within the meaning of the statute, and claimed that the documents were exempt pursuant to Exemption 5.

Exemption 5, which is the focus of this litigation, protects

inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency.

5 U.S.C. § 552(b)(5). Given the literal language of Exemption 5, it is not surprising that the courts have construed this exemption to encompass the protections traditionally afforded certain documents pursuant to evidentiary privileges in the civil discovery context.

The courts have recognized that Exemption 5 protects, as a general rule, materials which would be protected under the attorney-client privilege, *Mead Data Central*, 184 U.S.App.D.C. at 360–363, 566 F.2d at 252–255; the attorney work-product privilege, *NLRB v. Sears*, 421 U.S. at 154, 95 S.Ct. at 1518, *Bristol-Myers Co. v. FTC*, 194 U.S.App.D.C. 99, 598 F.2d 18 (1978); or the executive "deliberative process" privilege, *EPA v. Mink*, 410 U.S. [73] at 85–90, 93 S.Ct. [827] at 835–837 [35 L.Ed.2d 119]; *Vaughn v. Rosen*, 173 U.S. App.D.C. 187, 523 F.2d 1136 (1975) (*Vaughn II*).

*Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 862 (D.C.Cir.1980). *See also NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149, 95 S.Ct. 1504, 1515, 44 L.Ed.2d 29 (1975); and *Renegotiation Board v. Grumman Aircraft Engineering Corp.*, 421 U.S. 168, 184, 95 S.Ct. 1491, 1500, 44 L.Ed.2d 57 (1975). Of these privileges recognized under section (b)(5) of FOIA, *the only privilege claimed by appellants*, and considered by the court below, was the "deliberative

---

**17.** 5 U.S.C. § 552(a)(2) and (3). *See* note 14, *supra*.

process" privilege, sometimes called the "executive" or "governmental" privilege.[18]

▮ The deliberative process privilege protects "confidential intra-agency advisory opinions . . . disclosure of which would be injurious to the consultative functions of government." *Sears*, 421 U.S. at 149, 95 S.Ct. at 1516 (citations omitted). As was recently noted by Judge Wald in *Coastal States*, the deliberative process privilege is "unique to government" and

> has a number of purposes: it serves to assure that subordinates within an agency will feel free to provide the decision-maker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action.

617 F.2d at 866. *See also Jordan v. U. S. Dep't of Justice*, 591 F.2d 753, 772–774 (D.C. Cir.1978) (*en banc*). Thus, the privilege protects documents reflecting advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated, as well as other subjective documents that reflect the personal opinions of the writer prior to the agency's adoption of a policy. *See Sears*, 421 U.S. at 150, 95 S.Ct. at 1516; *Coastal States*, 617 F.2d at 866.

Notwithstanding these significant policy considerations underscoring the necessity that materials reflecting the deliberative process be protected, this exception to the general disclosure mandate of FOIA should be construed "as narrowly as consistent with efficient Government operation." *EPA v. Mink*, 410 U.S. 73, 87, 93 S.Ct. 827,

836, 35 L.Ed.2d 119 (1973) (quoting from legislative analysis and discussions of Exemption 5, S.Rep.No. 813, p. 9). *See also Coastal States*, 617 F.2d at 862. Thus, the courts have developed over the years certain specific limitations regarding the types of documents that are protected by the deliberative process privilege.

**B.** *"Predecisional" Versus "Post-Decisional" Documents and Inquiries Concerning the "Working Law of the Agency"*

▮ Exemption 5 does not apply to final agency actions that constitute statements of policy or final opinions that have the force of law, or which explain actions that an agency has already taken. *Ryan v. Department of Justice*, 617 F.2d 781, 790–91 (D.C.Cir.1980); *Sears*, 421 U.S. at 153–54, 95 S.Ct. at 1517–18 (1975). *See also Brinton v. Department of State*, 636 F.2d 600 at 604–605. (D.C.Cir.1980). Nor does Exemption 5 protect communications that implement an established policy of an agency. *Brinton, supra*, at 605. This latter limitation on Exemption 5 grew out of the Supreme Court's approval in *Sears* of the distinction drawn by lower courts between "predecisional communications, which are privileged, and communications made after the decision and designed to explain it, which are not." *Sears*, 421 U.S. at 151–52, 95 S.Ct. at 1516–17 (footnotes and citations omitted).

*Predecisional* documents are thought generally to reflect the agency "give-and-take" leading up to a decision that is characteristic of the deliberative process; whereas *post-decisional* documents often represent the agency's position on an issue, or explain such a position, and thus may constitute the "working law" of an agency. Accordingly, the courts have recognized little public interest in the disclosure of "reasons supporting a policy which an agency has rejected, or . . . reasons which might have supplied,

---

**18.** *See* Appellant's brief at 17. *See also Taxation With Representation Fund v. IRS*, 485 F.Supp. 263, 264 (D.D.C.1980). The District Court did find, however, that "the material at issue in this suit is not protected by the attor-

ney-client privilege and does not constitute protected attorney work product." *Id.* at 268. We can find no error with respect to this conclusion.

but did not supply, the basis for a policy which was actually adopted on a different ground." *Sears,* 421 U.S. at 152, 95 S.Ct. at 1517. However, the courts have recognized a strong public interest in the disclosure of reasons that *do* supply the basis for an agency policy actually adopted. As noted by the Supreme Court in *Sears:*

> Exemption 5, properly construed, calls for "disclosure of all 'opinions and interpretations' which embody the agency's effective law and policy, and the withholding of all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be." Davis, The Information Act: A Preliminary Analysis, 34 U.Chi.L. Rev. 761, 797 (1967); Note, Freedom of Information Act and the Exemption for Intra-Agency Memoranda, 86 Harv.L. Rev. 1047 (1973).

*Sears,* 421 U.S. at 153, 95 S.Ct. at 1517. While the predecisional/post-decisional dichotomy is useful as a starting point in distinguishing documents that are privileged from documents that are not, we must be careful not to lose sight of the primary thrust of the exemption in making these distinctions. Predecisional documents are not exempt merely because they are predecisional; they must also be part of the deliberative process by which a decision is made. *Mead Data Central, Inc. v. United States Department of Air Force,* 566 F.2d 242, 257 (D.C.Cir.1977); *Vaughn v. Rosen (Vaughn II),* 523 F.2d 1136, 1144 (D.C.Cir. 1975). *See also Coastal States,* 617 F.2d at 869. Moreover, a document that is predecisional at the time of preparation may lose exempt status if "adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public." *Coastal States,* 617 F.2d at 866. *See also Sears,* 421 U.S. at 161, 95 S.Ct. at 1521.

In analyzing any document for which protection against disclosure is sought under the deliberative process privilege in Exemption 5, it is well to recall the words of the Court in *Sears:*

[T]he public is vitally concerned with the reasons which did supply the basis for an agency policy actually adopted. These reasons, if expressed within the agency, constitute the "working law" of the agency and have been held by the lower courts to be outside the protection of Exemption 5 . . . .

This conclusion is powerfully supported by the other provisions of the Act. The affirmative portion of the Act, expressly requiring indexing of "final opinions," "statements of policy and interpretations which have been adopted by the agency," and "instructions to staff that affect a member of the public," 5 U.S.C. § 552(a)(2), represents a strong congressional aversion to "secret [agency] law" . . . and represents an affirmative congressional purpose to require disclosure of documents which have "the force and effect of law." . . . We should be reluctant, therefore, to construe Exemption 5 to apply to the documents described in 5 U.S.C. § 552(a)(2); and with respect at least to "final opinions," which not only invariably explain agency action already taken or an agency decision already made, but also constitute "final dispositions" of matters by an agency . . . we hold that Exemption 5 can never apply.

*Sears,* 421 U.S. 152–54, 95 S.Ct. 1517–18 (citations and footnote omitted).

### C. Function and Significance of the Document in the Agency Decisionmaking Process

 One way of determining whether a document in fact constitutes the "working law" of an agency is to consider the function and significance of the document in the agency's decisionmaking process. In *Sterling Drug, Inc. v. FTC,* 450 F.2d 698 (D.C. Cir.1971), this court distinguished memoranda prepared by the staff of the Federal Trade Commission from those "prepared, or at least issued, by the Commission itself."[19] With respect to the documents prepared by the Commission, the court noted that

---

19. *Sterling Drug, Inc. v. FTC,* 450 F.2d at 706.

the policy of promoting the free flow of ideas within the agency does not apply here, for private transmittals of binding agency opinions and interpretations should not be encouraged. These are *not the ideas and theories which go into the making of the law*, they are the law itself, and as such should be made available to the public. Thus, to prevent the development of secret law within the Commission, we must require it to disclose *orders and interpretations which it actually applies in cases before it.*

*Sterling*, 450 F.2d at 708 (emphasis added).

The test suggested in *Sterling* was recently expanded upon in *Coastal States*, 617 F.2d 854 (D.C.Cir.1980). In *Coastal States*, the documents in dispute were memoranda from regional counsel to auditors working in Department of Energy field offices. These memoranda were issued in response to requests for interpretations of regulations with respect to a particular set of facts encountered by field agents while conducting audits. DOE claimed that these memoranda were protected from disclosure pursuant to Exemption 5 because they were not "formal" interpretations of the regulations, nor were the interpretations "binding" on the audit staff. 617 F.2d at 859. However, the court rejected this contention and observed that:

DOE's contention that these documents are not "final opinions," absolutely binding on the auditors, misses the point. The evidence strongly supports the district court's conclusion that, in fact, these opinions were routinely used by agency staff as guidance in conducting their audits, and were retained and referred to as precedent. If this occurs, the agency has promulgated a body of secret law which it is actually applying in its dealings with the public but which it is attempting to

protect behind a label. This we will not permit the agency to do.[20]

617 F.2d at 869.

The court in *Coastal States* concluded that the regional counsel memoranda were not "predecisional" documents merely because they were part of an ongoing audit process; rather,

[t]hese documents, whatever the formal powers of regional counsel to issue binding interpretations of the regulations, in practice represent interpretations of established policy on which the agency relies in discharging its regulatory responsibilities; withholding them would serve no legitimate policy interest of the government.

617 F.2d at 869 (footnote omitted).

### D. *Nature of Decisionmaking Authority Vested in the Office or Person Issuing the Disputed Document*

■ An additional factor to be considered in determinations with respect to an application of the deliberative process privilege is the nature of the decisionmaking authority vested in the office or person issuing the disputed document. For example, in *NLRB v. Sears*, 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975), the Court held that Advice and Appeals Memoranda that explain decisions by the General Counsel of the NLRB not to file complaints are "final opinions" made in the "adjudication of cases" within the meaning of § 552(a)(2)(A), and hence fall outside the scope of Exemption 5. 421 U.S. at 158, 95 S.Ct. at 1520.

The Court in *Sears* distinguished between General Counsel memoranda concluding that no complaint should be filed with the NLRB in a particular case, from those memoranda directing that a complaint be issued and that litigation commence before

---

**20.** The District Court in *Coastal States* had also found that 1) the memoranda were indexed in some offices and used as precedent in later cases; 2) field personnel failed to follow a regional counsel opinion only if it could be distinguished on the facts, or the matter referred to a higher authority within the agency; 3) the memoranda were circulated among the area offices and supplied to new personnel; 4) the memoranda were "amended" or "rescinded" at times, "which would hardly be necessary if the documents contained merely informal suggestions to staff which could be disregarded;" and 5) on at least one occasion a regional counsel memorandum was cited to a member of the public as binding precedent. 617 F.2d at 860.

the Board. In the case of a decision not to file a complaint, the memoranda represents the final action of the agency because it is "an unreviewable rejection of the charge filed by the private party." *Id.* at 155, 95 S.Ct. at 1519.

> Disclosure of these memoranda would not intrude on predecisional processes, and protecting them would not improve the quality of agency decisions, since when the memoranda are communicated to the Regional Director, the General Counsel has already reached his decision and the Regional Director who receives them has no decision to make—he is bound to dismiss the charge.

*Id.* The Court noted further that these memoranda are "precisely the kind of agency law in which the public is so vitally interested and which Congress sought to prevent the agency from keeping secret." *Id.* at 156, 95 S.Ct. at 1519.

On the other hand, the Court in *Sears* found that memoranda that direct the filing of a complaint do come within Exemption 5 because they initiate a formal adjudication proceeding, in which the General Counsel will have the responsibility of advocating the position of the charging party. These memoranda are thus likely to contain an attorney's work product material. *Id.* at 154–60, 95 S.Ct. at 1518–21. The Court reasoned that since these memoranda are prepared in contemplation of upcoming litigation, will contain the General Counsel's theory of the case, and may communicate to the Regional Director some litigation strategy or settlement advice, they should not be subject to disclosure. *Id.* at 159–60, 95 S.Ct. at 1520–21. Moreover, the public's interest in disclosure of these memoranda is lessened by the fact that "the 'law' with respect to these cases will ultimately be made not by the General Counsel but by the

Board or the courts." *Id.* at 160, 95 S.Ct. at 1521.

Similarly, in *Renegotiation Board v. Grumman Aircraft Engineering Corp.*, 421 U.S. 168, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975), the Court held that certain reports prepared by a body without final decisionmaking authority were exempt from disclosure under section (b)(5) of the Act as deliberative materials. These reports, prepared by Regional Renegotiation Boards, were merely recommendations developed prior to the final decision by the full Board and were used as a basis for discussion in arriving at a final decision. 421 U.S. at 184–90, 95 S.Ct. at 1500–03. In addition, the Court emphasized that only the full Board had the power to make final decisions, that the Regional Boards were totally lacking in legal decisional authority, and that there was no evidence that the reasoning given in the Regional Board Reports was ever adopted by the full Board as its reasoning, even when the full Board agreed with the conclusion proffered in the Regional Board Report. 421 U.S. at 184–85, 95 S.Ct. at 1500–01.

However, in concluding that the Regional Board Reports were protected under Exemption 5, the Court's opinion was careful to note:

> We decline to consider whether this case would be different if the Regional Boards had *de facto* decisional authority—*i.e.,* if, instead of making up its own mind in each case, the Board "reviewed" the Regional Board's recommendation under a clearly erroneous or some other deferential standard; or if the Board failed even to review the vast bulk of the reports, absent special circumstances. There is no evidence in the record indicating that the Regional Boards had such *de facto* authority.

421 U.S. at 185, n.22, 95 S.Ct. at 1500, n.22.[21]

---

**21.** The Court found that the Regional Board's recommendations had *no operative effect independent of review by the full Board*, and that, moreover, review by the full Board was "an inevitable event" without which there would be no agency decision. 421 U.S. at 187, 95 S.Ct. at 1501. On this latter point, the Court distinguished Regional Board Reports from District Court opinions and the General Counsel memoranda discussed in *Sears*. 421 U.S. at 186, 95 S.Ct. at 1501.

### E. Flow of Documents From Superiors to Subordinates, or Vice Versa

In *Coastal States*, this court expanded upon the points discussed in *Sears* and *Renegotiation Board*, with respect to the factors to be considered in an application of the deliberative process privilege, by noting that:

[A] document from a subordinate to a superior official is more likely to be predecisional, while a document moving in the opposite direction is more likely to contain instructions to staff explaining the reasons for a decision already made.

617 F.2d at 868.

The significance of this factor was reiterated in *Brinton v. Department of State*, *supra*, at 605, where the court observed that "the paradigm of 'final opinions' [is that the documents] typically flow from a superior with policymaking authority to a subordinate who carries out the policy."

As will be indicated below, this factor—along with the others heretofore discussed—is important in this case because all of the disputed documents are used and relied upon by agency personnel after being reviewed and approved by superiors with decisionmaking authority.

### III. APPLICATION OF THE "DELIBERATIVE PROCESS" PRIVILEGE IN THIS CASE

Having reviewed the existing case law on the subject, we now turn to consider the application of the deliberative process privilege portion of Exemption 5 to the documents here in dispute.

### A. Documents Not Covered By This Opinion

For the reasons hereafter discussed, we affirm the judgment of the District Court, *except* with respect to the following documents:

■ (1) *GCMs that are never distributed.* The GCMs that are the focus of this litigation are documents that are revised to reflect the final position of the Assistant Commissioner (Technical) and are widely distributed throughout the agency. As we note below, such documents can find no protection from disclosure in Exemption 5. However, there may be situations where a GCM is merely considered and rejected by the Assistant Commissioner (Technical); in such instances—assuming that the unapproved document is never released for publication throughout the agency—the document would remain predecisional and/or purely deliberative, and thus protected under Exemption 5. We do not mean to suggest otherwise in this opinion.

(2) *TMs pertaining to proposed Treasury decisions or regulations that have never been approved.* As indicated in note 9, *supra*, the record is unclear as to what is done with TMs related to decisions and regulations that are never approved. We emphasize that this opinion covers only those TMs which, as a form of "legislative history," are issued in connection with decisions and regulations that have been approved by Treasury. We can find no compelling evidence or reason to support the disclosure of other TM documents, which would appear to be purely predecisional and deliberative in the absence of approval by Treasury of the related decision or regulation.

(3) *AODs recommending appeals of pending cases.* The record is somewhat unclear as to whether AODs recommending appeal are approved by the Assistant Commissioner (Technical), and whether such AODs ever contain discussions of litigation strategy. Indeed, it is not even entirely clear whether AODs recommending appeal are published and distributed in the same fashion as other AODs; nor is it clear whether these documents state "tentative" or "final" positions of the agency. In the absence of findings with respect to these points, we are unwilling to approve the District Court's order covering AODs recommending appeal. We will therefore remand for further consideration and appropriate findings by the District Court.

(4) *GCMs, TMs and AODs for which disclosure is sought at a "predecisional" stage.* As our opinion will make clear, the docu-

ments subject to disclosure here include materials that reflect the "working law" of the agency, in the form of final opinions, instructions or advice to staff, interpretative reports (explaining decisions or regulations), and the like. We are mindful of the fact that at various predecisional stages in the decisionmaking processes described, a GCM, TM or AOD may be nothing more than a purely deliberative/predecisional document. During the course of these predecisional stages, the documents are thus protected from disclosure under Exemption 5. Once adopted and released, however, the final documents are subject to disclosure under FOIA. In other words, this opinion merely reconfirms the point made in *Coastal States*, that

> even if the document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public.

617 F.2d at 866.

### B. *GCMs Subject to Disclosure*

■ Excluding those GCM documents referred to above in section III. A., we hereby affirm the judgment of the District court requiring disclosure under FOIA of the specific GCMs heretofore described in section I.[22]

As noted in our discussion above, GCMs are memoranda from the Chief Counsel to the Commissioner written originally for the purpose of guiding the Assistant Commissioner (Technical) concerning substantive issues on proposed revenue rulings, private letter rulings, and technical advice memoranda. The evidence also reveals that the same qualities that make these memoranda useful to the Assistant Commissioner (Technical) recommend the memoranda to agency lawyers for legal research and to agency field personnel in need of guidance in dealing with the public on certain tax liability issues. Moreover, the fact that earlier GCMs are constantly updated to reflect the current status of an issue within the Office of Chief Counsel,[23] combined with the "reconciliation" of positions taken by the Chief Counsel in GCMs with those ultimately adopted by the decisionmaker in the formal rulings, eliminates whatever deliberative character these documents may have had prior to their being "updated" or "reconciled." In essence, after a decision has been reached, a completed GCM becomes an expression of agency policy.

The GCM explains rulings issued by the Assistant Commissioner, and it serves as an interpretative guide and research tool for agency personnel. We are thus persuaded that GCMs function as a body of "working law" within the IRS.

As discussed above, GCMs are retained by the Office of Chief Counsel, and extensively cross-indexed and digested, as well as "updated," much like the service provided by Shepherd's. Completed GCMs are used as case precedent by staff attorneys preparing subsequent GCMs—"the interpretations of law contained in prior GCMs are knowingly applied, distinguished, or rejected of application, as the case may be, in subsequent GCM's to insure consistency of position in the Office of Chief Counsel." J.A. at 38. In addition, GCMs are used by IRS personnel to provide guidance "as to the positions to take in . . . negotiations" or conferences with taxpayers or taxpayer representatives. J.A. at 30. Thus, it is clear that these

---

**22.** We emphasize the particular nature of the GCMs here in issue because other judicial opinions have suggested different variations of GCMs. *See, e. g., Dick v. IRS*, 41 AFTR2d 78–639 (D.D.C.1978); *Cliff v. IRS*, 496 F.Supp. 568 (S.D.N.Y.1980). We deal here with GCMs covering substantive issues, in proposed letter rulings, revenue rulings, or technical advice memoranda, that are adopted by the Assistant Commissioner (Technical) and distributed throughout the agency.

**23.** From the Sebastian Affidavit, the District Court concluded that

> GCM's are maintained by the Office of Chief Counsel and frequently cited in subsequent GCM's to insure consistency, avoid duplication of research, provide a reference source, and update earlier memoranda when a position on an issue is sustained, modified, or changed within the Office of Chief Counsel.

485 F.Supp. at 266.

documents are relied upon as accurate representations of agency policy—"not the ideas and theories which go into the making of the law, [but] the law itself."[24] It is also clear that this reliance is *facilitated* and *encouraged* by the extensive indexing and digesting that the agency fosters with respect to these documents. This court in *Coastal States* found the routine use of the disputed documents by the agency staff in conducting their audits, when combined with the agency's orderly maintenance of the documents for future reference as precedent, militated in favor of a finding that the documents constituted "secret agency law." 617 F.2d at 869. A like finding is appropriate in this case.

In holding that GCMs are not exempt from disclosure as deliberative documents, we do not ignore the test of decisional authority posed in *Renegotiation Board*, and recently expanded upon by this court in *Coastal States* and *Brinton*. That test looks to whether a document was issued by a body possessing the authority to make the final decision as to which the document pertains. *Coastal States* and *Brinton* posit as a rule of thumb that "final" materials tend to flow from a superior with policy-making authority to a subordinate who carries out the policy, while "deliberative" materials typically flow from a subordinate to a superior official.[25]

While it is clear that GCMs initially flow from the adviser (the staff counsel and then the Chief Counsel), to the final decision-maker (the Assistant Commissioner (Technical)) with respect to a proposed ruling, it is equally clear that the "updating" and "reconciliation" processes described above serve to transform the memoranda from merely advisory documents to documents that reflect the agency's current position on a given issue. In other words, post-decisional GCMs—which are the focus of this opinion—flow from the Assistant Commissioner (Technical) and Chief Counsel to subordinate attorneys and other staff persons within the agency to be used as interpretative guides and research tools. As such, they cannot be viewed as deliberative/predecisional documents.

Thus, completed GCMs, even though originally advisory materials, are "adopted" as final statements of agency policy and function as the "working law" of the agency. Accordingly, we agree with the District Court's conclusion that completed GCMs are not protected under the "deliberative process" privilege.

### C. *TMs Subject to Disclosure*

█ We find that much of the same reasoning developed in our discussion of GCMs is applicable with respect to TMs because of the similarity in function and treatment of these two documents. The District Court's finding that TMs explain the reasons behind the adoption of final agency action is clearly supported by the record.

The record is replete with evidence indicating that TMs pertaining to regulations and decisions approved by Treasury may be fairly equated with "legislative history" accompanying a newly enacted statute. Indeed, there is even evidence to the effect that a TM may tell more about a regulation than the regulation itself. J.A. at 91.

Moreover, these explanatory memoranda are systematically filed under the Treasury Decision number to which they pertain and can be gotten "simply by looking at one of the tax services." J.A. at 100. The record also reveals that TMs are made available in the Legislation and Regulation Divisions for research by lawyers within the agency and IRS personnel who confer and negotiate with the public. J.A. at 31. As in the case of GCMs, these documents have been informally adopted by the agency as explanations of its policy, and are used by personnel within the agency as the "working law" of the agency. We therefore agree with the District Court's conclusion that, except with respect to the documents listed in section III. A., *supra*, TMs are not exempt from disclosure under FOIA.

---

**24.** *Sterling Drug*, 450 F.2d at 708.

**25.** *Coastal States*, 617 F.2d at 868; *Brinton*, at 605.

## D. *AODs Subject to Disclosure*

■ Finally, excluding those AODs referred to in section III. A. above (certain ones of which will be the subject of further review upon remand), we affirm the judgment of the District Court requiring disclosure of AODs.

Prior to publication and distribution, an AOD recommending "no appeal" is approved by the Assistant Commissioner (Technical). The AOD may be revised or withdrawn to correspond to changes in agency policy or positions. Final AODs are widely disseminated to agency personnel for use in legal research and in conferring with the public.

AODs that opt for "no appeal"—including cases of acquiescence or nonacquiescence—clearly pertain to the law that will be applied by the agency henceforth, and the explanations contained therein constitute explanations of the agency's "final" legal position on an issue. We conclude, therefore, that given the undisputed evidence at hand, final AODs recommending "no appeal" cannot possibly be viewed as deliberative/predecisional documents. On the authority of *Sears*, discussed at length, *supra*, we believe that the conclusion is inescapable that these documents are not protected from disclosure under Exemption 5.

## IV. CONCLUSION

Excluding those documents listed in section III. A., *supra*, we hereby affirm the judgment of the District Court requiring disclosure under FOIA of the GCM, TM and AOD documents identified in this litigation.

We shall remand this case to the District Court for further consideration and findings with respect to AODs recommending appeal. As to the other documents listed in section III. A., the District Court is instructed to modify its order to exclude any reference to or possible disclosure of such documents.

*So ordered.*