# Confidentiality of the Attorney General's
# Communications in Counseling the President

[The following memorandum examines the scope of confidentiality accorded the Attorney General's communications with the President, and the extent to which those communications may be shielded from compulsory disclosure to Members of Congress, the courts, and members of the public. It considers the dual nature of the Attorney General's role as Cabinet member and as principal legal adviser to the President, and extends to the broader question of the confidentiality of the deliberative materials generated by the Attorney General and those who assist him. The memorandum discusses the applicability of the doctrine of executive privilege, and the appropriate circumstances for its invocation. It also analyzes the scope of the deliberative process and attorney-client privileges under the Freedom of Information Act, and of the traditional governmental evidentiary privileges and their statutory counterparts.]

August 2, 1982

## MEMORANDUM FOR THE ATTORNEY GENERAL

You have asked this Office to advise you regarding the scope of confidentiality accorded your communications with the President in your role as Attorney General. Your inquiry focused particularly on the extent to which legal advice rendered by you to the President may be shielded from compulsory disclosure to Members of Congress, the courts, and members of the public. Our analysis of these issues includes the broader subject of the confidentiality of the deliberative materials generated by you, and those who assist you, in the performance of your responsibilities as adviser to the President. We also discuss briefly certain privileges which protect other communications generated by the Department of Justice in the course of performing its duties.

Any discussion of the confidential nature of the Attorney General's communications with the President must begin with a recognition of the dual counseling functions performed by the Attorney General. The Attorney General serves as both a Cabinet adviser and the principal legal adviser to the President.[1] As a member of the President's Cabinet, the Attorney General maintains a close and confidential advisory relationship with the President over a broad range of policy issues, including the highest and most delicate affairs of state. See, e.g., Rankin,

---

[1] In 1828 Attorney General Wirt described the Attorney General as "confidential law adviser to the Executive branch of the government." See H Cummings and C. McFarland, Federal Justice 91 (1937). In two lengthy essays analyzing the executive departments and the Attorney General in particular, former Attorney General Cushing described the department heads as the President's "constitutional counsellors," his "political or confidential ministers," and his "constitutional advisers." 7 Op. Att'y Gen 453 (1855), 6 Op. Att'y Gen. 326 (1854)

Assistant Attorney General, Office of Legal Counsel, "Memorandum for the Attorney General re: Secrecy of Cabinet Proceedings and Papers" (Oct. 15, 1954). This advisory relationship to the President, a relationship shared by all members of the President's Cabinet, is constitutionally based. Article II, § 2, of the Constitution provides that the President

> may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices. . . .

With respect to the Attorney General, this constitutional duty was carried over into statute by § 35 of the Judiciary Act of 1789, 1 Stat. 93, which required the Attorney General "to give his advice and opinions upon questions of law when required by the President of the United States." This provision is now codified in 28 U.S.C. § 511.[2]

We note, as a preliminary matter, that the confidentiality of the communications discussed herein cannot be analyzed without consideration of the contents of the communications, including the identities of the persons generating the communications and the persons to whom they are addressed, as well as the identities of the persons seeking disclosure. Generally speaking, however, the conclusions reached in this memorandum, and discussed in detail below, are as follows:

1. The President may assert an arguably absolute executive privilege against the Legislative Branch and in the courts to protect from disclosure communications involving military, diplomatic, or national security secrets;[3] a qualified

---

[2] The original language of § 35 of the 1789 Judiciary Act has remained virtually intact through subsequent codifications of the provision. See 28 U.S C. § 511 (1976), which provides:

> The Attorney General shall give his advice and opinion on questions of law when required by the President.

[3] See Halkin v. Helms, 598 F.2d 1 (D.C. Cir. 1978), holding that "[t]he state secrets privilege is absolute[,]" id. at 7, but permitting the district court to examine a classified affidavit in camera, in order to satisify itself of the validity of the claim of privilege with respect to the underlying classified information

Although the Supreme Court has not stated expressly that the privilege for military, diplomatic, and national security secrets is absolute, it has used very strong language to this effect. See, e.g., the Court's suggestion in United States v. Nixon, 418 U.S. 683, 711 (1974), that even in camera examination of documents may be inappropriate when a court is satisfied, "from all the circumstances of the case," that there exists a reasonable danger of disclosure of military, diplomatic, or national security secrets·

> As to the areas of Art. II duties [involving military or diplomatic secrets,] the courts have traditionally shown the utmost deference to Presidential responsibilities In C. & S. Air Lines v. Waterman S. S. Corp., 333 U.S 103, 111 (1948) [(emphasis added)], dealing with Presidential authority involving foreign policy considerations, the Court said:
>> "The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports are not and ought not to be published to the world. It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret."
> In United States v. Reynolds, 345 U.S. 1 [,10] (1953), . . . the Court said:
>> "It may be possible to satisfy the court, from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged. When this is the case, the occasion for the privilege is appropriate, and the court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers."

418 U.S. at 710-11 (emphasis added). See also United States v. Reynolds, 345 U.S. 1 (1953):

> In each case, the showing of necessity [for access to the documents] which is made will determine

Continued

executive privilege may be claimed to protect law enforcement investigatory files and sensitive deliberative communications between the Office of the President and the Attorney General's Office, as well as staff communications within the two offices which are reflective of the deliberative process. The President customarily reserves exclusively to himself the power to assert the claim of executive privilege against Congress.[4] However, the Attorney General, as "head of [an executive] department which has control over the matter," may, after personal consideration of the matter, invoke the privilege against others in court. *United States* v. *Reynolds,* 345 U.S. 1, 8 (1953).[5]

2. The Attorney General may assert a "deliberative process" privilege pursuant to exemption 5 of the Freedom of Information Act, 5 U.S.C. § 552(b)(5), to withhold from the public nonfactual deliberative communications; absent a breach of the confidentiality of the privileged communication, the President, or the Attorney General on his behalf, may assert the attorney-client privilege pursuant to exemption 5 of the Freedom of Information Act, 5 U.S.C. § 552(b)(5). Similarly, absent a waiver of the privilege, the Attorney General may assert the common-law privilege for attorney-client communications, which has been codified in Rule 501 of the Federal Rules of Evidence, and Rule 26 of the Federal Rules of Civil Procedure, to protect from disclosure in litigation certain confidential communications of a legal advisory nature which were prepared for the Office of the President.

3. Finally, this memorandum addresses the traditional "governmental" evidentiary privileges which, although available to the Attorney General, only

how far the court should probe in satisfying itself that the occasion for invoking the privilege is appropriate Where there is a strong showing of necessity, the claim of privilege should not be lightly accepted, *but even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake.*

345 U.S. at 11 (footnote omitted) (emphasis added). *See generally* Daniel, Assistant Attorney General, Civil Division, "Memorandum to All Civil Division Attorneys re: Asserting Claims of Official Governmental Privilege in Litigation" (Nov. 1980); Rehnquist, Assistant Attorney General, Office of Legal Counsel, "Testimony on Executive Privilege before the Senate Judiciary Subcommittee on Separation of Powers" (Aug 4, 1971). *Cf American Civil Liberties Union* v. *Brown,* 619 F.2d 1170 (7th Cir. 1980) *(en banc),* and *Halkin* v. *Helms, supra,* both construing *Reynolds, supra,* and *Nixon, supra,* to permit *in camera* examinations of documents for which the state secrets privilege was claimed in certain exceptional circumstances. *American Civil Liberties Union, supra,* held that a litigant's strong showing of need, *e.g.,* that withheld documents were critical to substantiate a claim of constitutional violation, may compel the district court to conduct *in camera* review of documents allegedly covered by state secrets privilege in order to determine whether they are properly classified

[4] This limitation on the exercise of the privilege against Congress stems from a practice instituted by Presidents Kennedy and Johnson, that "Executive privilege can be invoked only by the President and will not be used without specific Presidential approval," letter from President Kennedy to Congressman Moss (Mar 7, 1962), and formalized in *President Nixon's "Memorandum for the Heads of Executive Departments and Agencies"* (Mar. 24, 1969) To date, subsequent administrations have followed this practice. *See* Olson, Assistant Attorney General, Office of Legal Counsel, "Memorandum to the Attorney General re: Executive Privilege" (Oct 9, 1981); Harmon, Assistant Attorney General, Office of Legal Counsel, "Memorandum to All Heads of Offices, Divisions, Bureaus and Boards of the Department of Justice" (May 23, 1977). *See generally Common Cause* v. *NRC,* 674 F.2d 921, 935 (D.C. Cir 1982) (dictum to the effect that only the President may assert executive privilege).

[5] Although assertion of the state secrets privilege clearly requires that the claim be made by the head of an agency, the case law governing other claims of executive privilege in litigation is not settled with respect to who must assert the privilege. *Compare Union Oil* v *Morton,* 56 F.R.D 643 (C.D. Cal 1972); *FTC* v. *Bramman,* 54 F.R.D. 364 (W.D. Mo 1972); (recognizing claims made by persons other than agency heads), *with Anchem Products* v. *GAF Corp,* 64 F.R.D. 550 (N.D. Ga 1974); *Carter* v *Carlson,* 56 F.R D. 9 (D.D.C. 1972) *See also* Daniel, "Asserting Claims of Official Governmental Privilege in Litigation," *supra* note 3 (recommending that *all* claims of governmental privilege in litigation, other than those relating to the informant's privilege, be formally asserted by the heads of agencies).

rarely would be applicable to his communications with the President. These privileges, which have analogues in the Freedom of Information Act, protect (a) confidential information which certain employees or members of the public are required to report on government records, (b) the identity of government informants, and (c) certain law enforcement investigatory files.[6]

## I. Executive Privilege

The doctrine of executive privilege defines the constitutional authority of the Executive Branch to protect documents or information in its possession from public disclosure and from the compulsory process of the Legislative and Judicial Branches. *See* Rehnquist, Assistant Attorney General, Office of Legal Counsel, Testimony on Executive Privilege Before Senate Judiciary Subcommittee on Separation of Powers (Aug. 4, 1971). Executive privilege protects material the disclosure of which would significantly impair the conduct of foreign relations, the national security, or the performance of the Executive's lawful duties.[7] It also shields confidential deliberative communications which have been generated within the Executive Branch from compulsory disclosure, in the absence of a strong showing of need by the branch seeking disclosure that access to the privileged communications is critical to the responsible fulfillment of its constitutional functions. *Nixon* v. *Administrator of General Services,* 433 U.S. 425, 441–55 (1977); *United States* v. *Nixon,* 418 U.S. 683, 711–12 (1974); *Senate Select Committee on Presidential Campaign Activities* v. *Nixon,* 498 F.2d 725, 730–31 (D.C. Cir. 1974) *(en banc).* This privilege is based on the need for confidentiality of communications among high-level government officials, as well as the constitutional doctrine of separation of powers, which provides that each branch of government is "suprem[e] . . . within its own assigned area of constitutional duties." *United States* v. *Nixon, supra* at 705.

### A. Constitutional and Practical Bases of the Privilege

The necessity for confidentiality in the advisory relationships between Cabinet advisers and the President, and their respective aides, is of both constitutional and practical significance. *See United States* v. *Nixon, supra; Senate Select Committee on Presidential Campaign Activities* v. *Nixon, supra. See also* Opinion of the Attorney General for the President, "Assertion of Executive Privilege in Response to a Congressional Subpoena," 43 Op. Att'y Gen. ____, 5 Op. O.L.C. 27 (Oct. 13, 1981) (hereafter 1981 Attorney General Opinion); Harmon, Assistant Attorney General, Office of Legal Counsel, "Memorandum for the

---

[6] *See* Daniel, "Asserting Claims of Official Governmental Privilege in Litigation," *supra* note 3. *See also FOIA* exemption 6, which protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," § 552(b)(6); and exemption 7, which shields certain law enforcement investigatory records, § 552(b)(7).

[7] Because the types of communications discussed in this memorandum are less likely to implicate military, diplomatic, or national security interests, the qualified privilege for law enforcement files, *see* n 33 *infra,* and for sensitive advisory or deliberative communications, provides a more appropriate focus for our analysis.

Attorney General re: The Constitutional Privilege for Executive Branch Deliberations: The Dispute with a House Subcommittee over Documents Concerning Gasoline Conservation Fee" (Jan. 18, 1981) (hereafter Harmon Memorandum); Rehnquist Testimony, *supra*.[8] It is premised on the need to discuss confidential matters which arise within the Executive Branch and to assist the President in the discharge of his constitutional powers and duties, by ensuring discussion that is free-flowing and frank, unencumbered by fear of disclosure or intrusion by the public or the other branches of government. The President and those who assist him require candid advice on the wide range of issues which confront the Executive, and such candid advice may not be forthcoming if Cabinet advisers or their aides must anticipate disclosure of the advice rendered by them and the potential public or legislative criticism which might result therefrom.

A unanimous[9] Supreme Court in *United States* v. *Nixon, supra,* affirmed the constitutional underpinnings of the privilege, recognizing the "protection of communications between high Government officials and those who advise and assist them in the performance of their manifold duties" as supported by the doctrine of separation of powers, and by historic practice.[10] The Court described this constitutional and historic basis as "too plain to require further discussion." *Id.* at 705. *See also Senate Select Committee, supra.* The Court went on to state that "human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *United States* v. *Nixon, supra* at 705. Such "temper[ed] candor" in presidential advisers' deliberations clearly would impede the President's performance of his constitutional duty to exercise the executive powers described in Art. II, § 3 of the Constitution. *See Nixon* v. *Administrator of General Services, supra; United States* v. *Nixon, supra.*

The Supreme Court and lower federal courts have made clear that the presumption of confidentiality accorded presidential communications is intended to protect not only the substance of sensitive communications between the President

---

[8] *See generally* Rankin, Assistant Attorney General, Office of Legal Counsel, "Memorandum for the Attorney General re. Secrecy of Cabinet Proceedings and Papers" at 3 (Oct 15, 1954)·

   [T]he special and perhaps most significant aspect of [Cabinet members'] office is that of trusted adviser to the Chief Executive in the affairs of the Nation, a relationship which cannot long be maintained with respect to those feeling themselves at liberty to make unauthorized disclosures of information imparted to them at Cabinet meetings in strict confidence, and accordingly . . . each member, to retain the confidence of the President, must constantly bear in mind the overriding need for scrupulous observance of the secrecy of Cabinet proceedings and papers

[9] Justice Rehnquist did not participate in this decision 418 U.S. at 685

[10] The Court noted that the 1787 Constitutional Convention had been conducted by the Framers in complete privacy, and that the records of the Convention were sealed for more than 30 years thereafter. 418 U S at 705, n 15 *See* 1 M Farrand, The Records Of The Federal Convention of 1787, pp. xi–xxv (1911), 3 Stat. 475, 15th Cong , 1st Sess , Res. 8 (1818). *See also* C Warren, The Making Of The Constitution 134–39 (1937)

   The need for confidential deliberations is not unique to the Executive Branch The Framers recognized that some congressional deliberations would of necessity be privileged from publication, Art. 1, § 5, cl 3, or from questioning beyond the House or Senate floor, Art. I, § 6, cl 1. Similarly, judicial deliberations, as well as discussions between judges and their law clerks, are undoubtedly privileged, although neither the Executive nor the Legislative Branches has ever attempted to challenge the right of courts to withhold such information. *See generally Nixon* v. *Sirica,* 487 F.2d 700, 717 (D C Cir. 1973) *(en banc); Soucie* v. *David,* 448 F 2d 1067, 1080–81 (D C Cir 1971) (Wilkey, J., concurring), Henkin, "The Right to Know and the Duty to Withhold. The Case of the Pentagon Papers," 120 U. Pa L. Rev 271, 274 (1971)

and his advisers but the integrity of the decisionmaking process within the Executive Branch as well.[11] *See Nixon* v. *Administrator of General Services, supra; Senate Select Committee, supra; Nixon* v. *Sirica,* 487 F.2d 700 (D.C. Cir. 1973) *(en banc). See also* 1981 Attorney General Opinion *supra;* Harmon Memorandum, *supra.* It is these concerns which justify the invocation of executive privilege by the President, or, where appropriate, the heads of executive departments, as well as the "deliberative process" privilege, which may be claimed by any federal agency pursuant to exemption 5 of the Freedom of Information Act, 5 U.S.C. § 552(b)(5), to withhold documents requested by members of the public.[12]

## B. Limitations on the Scope of the Privilege

Notwithstanding the necessity for confidentiality in executive deliberations, the privilege against their disclosure to Congress and the courts is qualified, in both scope and application. First, the executive privilege for intragovernmental deliberations does not protect materials the disclosure of which would not implicate or hinder the Executive Branch's decisionmaking processes. *United States* v. *Nixon, supra.* Thus, factual, nonsensitive materials—communications from the Attorney General which do not contain advice, recommendations, tentative legal judgments, drafts of documents, or other material reflecting deliberative or policymaking processes—do not fall within the scope of materials for which executive privilege may be claimed as a basis of nondisclosure. *Cf., e.g., NLRB* v. *Sears, Roebuck & Co.,* 421 U.S. 132 (1975); *Taxation With Representation* v. *IRS,* 646 F.2d 666 (D.C. Cir. 1981); *Coastal States Gas Corp.* v. *Department of Energy,* 617 F.2d 854, 866–69 (D.C. Cir. 1980).[13]

Second, even in cases involving sensitive deliberative materials for which a claim of privilege may be appropriate, the executive interest in nondisclosure must be balanced against the needs of the requesting branch before the validity of the claim of privilege can be determined. It is in these cases of potential conflict and competing claims of legitimate need by each branch that the separation of

---

[11] In its analysis of executive privilege in *United States* v. *Nixon, supra,* the Supreme Court discussed the role of confidentiality among presidential advisers and concluded:

> The expectation of a President to the confidentiality of his conversations and correspondence . . is [grounded on] the necessity for protection of the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking. A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately. These are the considerations justifying a presumptive privilege for Presidential communications. The privilege is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution.

418 U S. at 708 (footnote omitted).

[12] The deliberative process privilege will be discussed *infra* in part II A.

[13] The standard for nondisclosure under a claim of executive privilege is analogous to the "deliberative process" privilege codified in the Freedom of Information Act, 5 U.S.C. § 552(b)(5), which exempts predecisional and deliberative documents from the general disclosure mandate of the Act. *See generally McClelland* v *Andrus,* 606 F.2d 1278, 1287 n.54 (D C. Cir. 1979) However, Congress may not expand the public's statutory right to disclosure under FOIA beyond those limits set, in any given case, by the constitutional doctrine of executive privilege, *Soucie* v. *David,* 448 F.2d 1067, 1071–72, n 9, 1081–83 (D.C Cir. 1971); conversely, because of its constitutional basis independent of FOIA, Congress may not limit the scope of executive privilege by altering the standards for disclosure under FOIA. *Id.*

powers principle on occasion must yield to the principles of "a workable government"—"separateness but interdependence, autonomy but reciprocity." *United States* v. *Nixon, supra* at 707 (quoting *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U.S. 579, 635 (1952) (Jackson, J., concurring)). These principles recognize a "spirit of dynamic compromise" among the coordinate branches when a conflict in authority arises—a spirit which requires each branch to "take cognizance of an implicit constitutional mandate to seek optimal accommodation through a realistic evaluation of the needs of the conflicting branches in a particular fact situation." *United States* v. *AT&T,* 567 F.2d 121, 127 (D.C. Cir. 1977). This duty to recognize and accommodate the legitimate needs of the other branches was examined in its constitutional context by the D.C. Circuit in *United States* v. *AT&T, id.* at 130 (footnote omitted):

> [I]t was a deliberate feature of the constitutional scheme to leave the allocation of powers unclear in certain situations . . . [Thus,] the resolution of conflict between the coordinate branches in these situations must be regarded as an opportunity for a constructive *modus vivendi,* which positively promotes the functioning of our system. The Constitution contemplates such accommodation. Negotiation between the two branches should thus be viewed as a dynamic process affirmatively furthering the constitutional scheme.

*See also* 1981 Attorney General Opinion, *supra,* 5 Op. O.L.C. at 30 ("The accommodation required is not simply an exchange of concessions or a test of political strength. It is an obligation of each branch to make a principled effort to acknowledge, and if possible to meet, the legitimate needs of the other branch.").

The more generalized the executive interest in withholding the disputed information, the more likely it is that the claim of privilege will yield to a specific, articulated need related to the effective performance by the coordinate branches of their constitutionally assigned functions. Conversely, the more specific the need for confidentiality, and the less specific the articulated need of the requesting branch for the information, the more likely it is that the Executive's need for confidentiality will prevail. *Nixon* v. *Administrator of General Services, supra; United States* v. *Nixon, supra. See generally* 1981 Attorney General Opinion, *supra;* Harmon Memorandum, *supra.* Thus, in determining whether to assert the privilege, the Executive, in the first instance, must balance the "public" interest[14] inherent in the "general privilege of confidentiality of Presidential communications in performance of the President's responsibilities" against the national or public interest in disclosure, as determined by the ability

----

[14] The "public" interest in nondisclosure derives from the recognized value which accrues to the public from an effective executive decisionmaking process, supported by the exchange of "candid, objective, and even blunt or harsh opinions." *United States* v. *Nixon, supra* at 708, and fostered by ensuring the confidentiality of such opinions. *Nixon* v. *Sirica, supra* at 717 *See also McClelland* v. *Andrus,* 606 F.2d 1278, 1287 n.55 (D.C. Cir 1979) (citations omitted) (recognizing the "compelling public [interest in] confidentiality" which is "[n]owhere . more vitally involved than in the fidelity of the sovereign's decision and policymaking resources ") *See generally* Rehnquist Testimony, *supra*

of the requesting branch responsibly to fulfill its constitutional duties without the assistance provided by the requested documents. *United States* v. *Nixon, supra,* 418 U.S. at 706, 711–712. *See Nixon* v. *Sirica, supra,* 487 F.2d at 716–17. In making such a determination, each document—and the role that it plays in the decisionmaking process—must be examined individually. *Playboy Enterprises* v. *Department of Justice,* 677 F.2d 931, 935 (D.C. Cir. 1982); *Coastal States, supra,* 617 F.2d at 867.

In the case of Congress, the grant of legislative power in Article I of the Constitution implies a requirement that Congress have access to pertinent information, as well as the authority to summon witnesses and to compel the production of needed evidence, as a prerequisite to the proper performance of its legislative function. *Jurney* v. *MacCracken,* 294 U.S. 125 (1935); *McGrain* v. *Daugherty,* 273 U.S. 135 (1927). *See generally* Rehnquist Testimony, *supra.* Congress' duty to investigate and inform itself of matters which may involve the Executive is very broad, extending "over the whole range of the national interests concerning which Congress might legislate or decide upon due investigation not to legislate." *Barenblatt* v. *United States,* 360 U.S. 109, 111 (1959). *See also Eastland* v. *United States Servicemen's Fund,* 421 U.S. 491, 504–07 (1975); *Watkins* v. *United States,* 354 U.S. 178, 187 (1957). *See generally* Cox, "Executive Privilege," 122 U. Pa. L. Rev. 1383, 1426 (1974). This broad-based power of inquiry includes matters requiring new or remedial legislation, appropriations of funds, congressional probes into various governmental departments to expose corruption, inefficiency, or waste, as well as the administration of existing laws or proposed statutes. Yet, these very sources of Congress' power to obtain information also outline the limits of that power: Congress may only inquire into those matters on which it may potentially legislate or appropriate—it may not inquire into those matters "which are within the exclusive province" of the Executive or the Judiciary. *Barenblatt, supra* at 112. *See Watkins, supra.* Nevertheless, the validity of a claim of privilege for documents demanded by Congress in the performance of its legitimate legislating functions, including the "oversight" function, can only be determined by balancing the particular interests of the Legislative and Executive Branches against each other in each case, in light of the possibility of accommodation. *Senate Select Committee, supra.*[15]

---

[15] *See, e g.,* 1981 Attorney General Opinion, *supra,* discussing the relatively weak congressional interest in obtaining predecisional, deliberative Executive Branch documents in the context of Congress' performance of its general "oversight" function, as compared to its consideration of specific legislative proposals

> At the stage of oversight, the congressional interest is a generalized one of ensuring that the laws are well and faithfully executed and of proposing remedial legislation if they are not. The information requested is usually broad in scope and the reasons for the request correspondingly general and vague. In contrast, when Congress is examining specific proposals for legislation, the information which Congress needs to enable it to legislate effectively is usually quite narrow in scope and the reasons for obtaining that information correspondingly specific. A specific, articulated need for information will weigh substantially more heavily in the constitutional balancing than a generalized interest in obtaining information

> [Moreover,] the congressional oversight interest will support a demand for predecisional, deliberative documents in the possession of the Executive Branch only in the most unusual circumstances It is important to stress that congressional oversight of Executive Branch actions is justifiable only *as a means* of facilitating the legislative task of enacting, amending, or repealing laws When such "oversight" is used as a means of participating directly in an ongoing process of decisionmaking

Continued

488'

Similarly, with respect to judicial functions, an evaluation must be made of the impact of a successful claim of executive privilege on the ability of the Judiciary to perform effectively its duties of fair adjudication of controversies and supervision of grand jury investigations. *See United States* v. *Nixon, supra; Nixon* v. *Sirica, supra.* As is the case when the privilege is asserted against the Legislative Branch, if the information withheld by the Executive is "demonstrably critical to the responsible fulfillment" of the Judiciary's functions, a generalized claim of privilege must fail. *Nixon* v. *Sirica,* 487 F.2d at 717 ("the general confidentiality privilege must recede before the grand jury's showing . . . that the subpoenaed [information] contain[s] evidence peculiarly necessary to the carrying out of [its] vital function."). *Cf. Senate Select Committee,* 498 F.2d at 731.

Notwithstanding these limitations on the scope of the privilege for Executive Branch communications, it is not essential that the communications for which the privilege is claimed have been directed to or emanated from the President himself. *See* Nixon, "Memorandum for the Heads of Executive Departments and Agencies" (March 24, 1969). *See also United States* v. *AT&T, supra;* Harmon Memorandum, *supra.* The underlying rationale of the privilege to foster robust and honest debate in the presidential decisionmaking process is as applicable to Executive Branch advisers both within and outside the immediate Office of the President as it is to the President himself. The Supreme Court, in *United States* v. *Nixon, supra,* recognized the need for the President *"and those who assist him* [to] be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately."* 418 U.S. 708 (emphasis supplied). In addition, this office has recently expressed the view that because of the importance of the executive department heads and their advisers to the President and his closest advisers in presidential decisionmaking, it would be "artificial" to draw a rigid and inflexible line between the executive departments and the President's Office, limiting the reach of the constitutional privilege only to the latter. Harmon Memorandum, *supra* at 13–14.[16] Thus, memoranda prepared by the Attorney General or his assistants containing legal or policy advice on issues under consideration by the President and his advisers may be properly encompassed by a claim of executive privilege. This category of documents would include, for example, staff level advice to Assistant Attorneys General concerning matters on which the President has

---

within the Executive Branch, it oversteps the bounds of the proper legislative function Restricted to its proper sphere, the congressional oversight function can almost always be properly conducted with reference to information concerning decisions which the Executive Branch has already reached Congress will have a legitimate need to know the preliminary positions taken by Executive Branch officials during internal deliberations only in the rarest of circumstances.

5 Op O L.C at 29 (citations omitted)

[16] Nevertheless, former Assistant Attorney General Harmon's January 18, 1981, memorandum recognized that there exist "differences of degree" of sensitivity inherent in the broad category of executive deliberations. The memorandum pointed out that in deciding whether to claim the privilege, it is especially important to protect the integrity of deliberations involving the President himself and his closest advisers.

In accommodating Congress's legitimate need for certain information, the executive branch should be least willing to reveal deliberations directly involving the President and his closest advisers, and more willing to disclose material from within the executive departments.

Harmon Memorandum, *supra,* at 13

sought advice, staff level advice to officials in the Office of the President, notes of middle level staff meetings concerning issues before the President or members of his staff, and tentative legal judgments or draft policy statements prepared for the President or his staff.

For purposes of invoking executive privilege, communications from the Attorney General, *qua* the President's chief legal adviser, should be analyzed in the same fashion as communications from other Cabinet advisers and trusted high-level officials. Unlike the attorney-client privilege, which focuses exclusively on communications of a *legal* advisory nature, executive privilege may be claimed for any nonfactual, sensitive deliberative communication for which there exists a sufficiently strong public interest in nondisclosure. While it is unlikely that very many of the Attorney General's communications will be in the category of communications with regard to which claims of privilege are entitled to the strictest deference, *e.g.*, military, diplomatic, or sensitive national security matters, his communications to the President may nevertheless demand greater confidentiality than those of some other Cabinet advisers, because of the nature of the Attorney General's responsibilities to the Executive and his special areas of expertise, *e.g.*, legal advice and law enforcement. *See* Harmon Memorandum, *supra*, at 26.[17]

## II. The Freedom of Information Act—Exemption 5: The Deliberative Process Privilege and the Attorney-Client Privilege

Exemption 5 of the Freedom of Information Act (FOIA)[18] protects from compulsory disclosure to the public, government materials which are "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This exemption thus codifies the traditional common law privileges afforded certain documents in the context of civil litigation and discovery, *see* Fed. R. Civ. P. 26; Fed. R. Evid. 501, including the executive "deliberative

---

[17] In his memorandum to the Attorney General regarding a congressional subcommittee's demand for certain documents from the Department of Energy, Assistant Attorney General Harmon advised:

> [T]o whatever extent the customary attorney-client privilege applies to government attorneys, we believe that the reasons for the constitutional privilege against the compelled disclosure of executive branch deliberations have special force when legal advice is involved. None of the President's obligations is more solemn than his duty to obey the law. The Constitution itself places this responsibility on him, in his oath of office and in the requirement of article II, section 3 that "he shall take care that the laws be faithfully executed." Because this obligation is imposed by the Constitution itself, Congress cannot lawfully undermine the President's ability to carry it out. Moreover, legal matters are likely to be among those on which high government officials most need, and should be encouraged to seek, objective, expert advice. As crucial as frank debate on policy matters is, it is even more important that legal advice be "candid, objective, and even blunt or harsh," *see United States* v. *Nixon*, 418 U.S. 683, 708 (1974), where necessary. Any other approach would jeopardize not just particular policies and programs but the principle that the government must obey the law. For these reasons, it is critical that the President and his advisers be able to seek, and give, candid legal advice and opinions free of the fear of compelled disclosure

Harmon Memorandum, *supra*, at 26

[18] While other exemptions to the FOIA occasionally may be applicable to the types of communications discussed in this memorandum, *e g.*, the exemption 7 privilege for law enforcement investigatory records, *see* 5 U.S.C. § 552(b)(7) discussed in part III C., *infra*, because of the Attorney General's advisory relationship to the President, most such communications will come within the privileges embraced by exemption 5.

process" privilege, *NLRB* v. *Sears, supra; EPA* v. *Mink,* 410 U.S. 73 (1973); *Taxation With Representation* v. *IRS,* 646 F.2d 666 (D.C. Cir. 1981); the attorney-client privilege, *Brinton* v. *Department of State,* 636 F.2d 600, 603–04 (D.C. Cir. 1980), *cert. denied,* 452 U.S. 905 (1981); *Mead Data Central* v. *United States Department of Air Force,* 566 F.2d 242, 252–55 (D.C. Cir. 1977); and the attorney work-product privilege, *NLRB* v. *Sears, Roebuck & Co.,* 421 U.S. 132, 154 (1975); *Bristol-Myers Co.* v. *FTC,* 598 F.2d 18 (D.C. Cir. 1978), as applied to document requests of government agencies from members of the public. *See also Coastal States Gas Corp.* v. *Department of Energy,* 617 F.2d 854 (D.C. Cir. 1980). All of these privileges encompassed by exemption 5 may be claimed, in appropriate circumstances, to protect communications between the Attorney General's Office and the Office of the President from compulsory disclosure to members of the press and the general public.[19] Nevertheless, even though the FOIA exemptions noted above are analogous to the common law evidentiary privileges which have been incorporated by implication into the Act, the standards for asserting the evidentiary privileges can serve only as a "rough guide" to the courts in determining the validity of FOIA exemption claims. This is so because

> decisions as to discovery are usually based on a balancing of the relative need of the parties, and standards vary according to the kind of litigation involved. Furthermore, the most fundamental discovery and evidentiary principle, relevance to the issues being litigated, plays no part in FOIA cases.

*Coastal States, supra,* at 862, citing *EPA* v. *Mink,* 410 U.S. 73, 86 (1973). *See also Playboy Enterprises* v. *Department of Justice,* 677 F.2d 931, 936 (D.C. Cir. 1982); *McClelland* v. *Andrus,* 606 F.2d 1278, 1287 nn. 54, 55 (D.C. Cir. 1979).[20]

## A. *"Deliberative Process" Privilege*

The "deliberative process" privilege under FOIA is substantially similar in scope and purpose to the deliberative process aspect of executive privilege,

---

[19] The exemptions contained in the Freedom of Information Act do "not [provide] authority to withhold information from Congress." 5 U.S.C. § 552(c)

[20] In explaining the relationship between the privileges under FOIA and the evidentiary privileges in litigation, the D C. Circuit stated:

> [T]he analysis contained in Exemption 5 cases is applicable [to common law discovery cases] because Exemption 5 exempts only those documents normally privileged in the civil discovery context *NLRB* v *Sears, Roebuck & Co ,* 421 U.S. 132, 148–49 . . (1975); *EPA* v *Mink, . . .* 410 U S. at 85–86 . . (1973); *Vaughn* v *Rosen,* 523 F.2d at 1143 (1975). Thus in effect Exemption 5 is co-extensive with the common law discovery privileges: Exemption 5 shields from a member of the public seeking a document under FOIA that which would be shielded from a litigant seeking discovery from an agency. There is, however, an additional factor to be considered in the discovery context that is not considered in the FOIA context . When a party seeks discovery against the Government and the Government interposes a claim of privilege, it is appropriate for the court to consider the litigant's need for the material. But when a member of the public seeks access to material under FOIA and the Government claims that the material comes within the purview of Exemption 5, disclosure is permitted of that which would "routinely be disclosed" in private litigation. H.R Rep. No 1497, 89th Cong , 2d Sess. 10 (1966). *Stated differently, the extent of the requester's need is not considered in the FOIA context*

*McClelland* v. *Andrus, supra,* at 1287, n.54 (emphasis supplied).

491

discussed above. Although both privileges apply generally to the same types of documents, the primary differences between the two privileges lie in their respective applications. First, executive privilege traditionally has been invoked only by the President to shield documents from disclosure to Congress, and by the President or the head of any executive department or agency in judicial proceedings.[21] FOIA exemptions, in contrast, may be claimed by the head, or other designated official, of any government agency in possession of documents for which a request has been made by a member of the public. Second, as noted above, claims of executive privilege for deliberative documents must be balanced against the public interest in disclosure, which is frequently analyzed in terms of the requesting government institution's ability to perform its functions responsibly—whether legislative investigations or judicial resolution of disputes—without gaining access to the disputed materials. In considering the claims of exemptions under FOIA, however, the requestor's interest in or need for the documents is irrelevant. *See* H.R. Rep. No. 1497, 89th Cong., 2d Sess. 10 (1966); *McClelland* v. *Andrus, supra*. Notwithstanding these differences, the analyses involved in the applications of the two privileges are very similar.

As in the case of executive privilege, the "deliberative process" privilege embraced by exemption 5 was intended to protect the integrity of the decision-making process and to promote full and frank deliberations during that process. However, consistent with the strong disclosure policy of FOIA, the privilege is to be considered " 'as narrowly as [is] consistent with efficient Government operation.' " *Coastal States, supra,* 617 F.2d at 868, quoting from S. Rep. No. 813, 89th Cong., 1st Sess. 9 (1965). *See also FBI* v. *Abramson,* 456 U.S. 615, 629–32 (1982); *Department of Air Force* v. *Rose,* 425 U.S. 352, 360–62 (1976). The privilege exempts documents which are advisory or recommendatory in nature, reflecting "the give-and-take of the consultative process . . ., weighing the pros and cons of agency adoption of one viewpoint or another," *Coastal States, supra,* 617 F.2d at 866, and "other subjective documents that reflect the personal opinions of the writer prior to the agency's adoption of a policy." *Taxation With Representation, supra,* 646 F.2d at 677. *See also NLRB* v. *Sears, supra,* 421 U.S. at 150; *Brinton* v. *Department of State, supra,* 636 F.2d at 604–06. In the words of the D.C. Circuit, which has developed a considerable body of law construing the deliberative process privilege:

> [The privilege] was created to protect the deliberative process of the government, by ensuring that persons in an advisory role would be able to express their opinions freely to agency decision-makers without fear of publicity. . . . Such consultations are an integral part of [an agency's] deliberative process; to conduct this process in public view would inhibit frank discussion of policy matters and likely impair the quality of decisions.

---

[21] *See* nn. 4, 5, *supra*.

*Ryan* v. *Department of Justice*, 617 F.2d 781, 789–90 (D.C. Cir. 1980) (footnote omitted). In addition, the privilege was designed to

> protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action.

*Coastal States, supra*, 617 F.2d at 866.

Applying this standard to the materials discussed in this memorandum, documents reflecting the internal details involved in the preparation of formal Attorney General opinions or Office of Legal Counsel opinions, as well as the more informal predecisional working papers which pass between and within the Attorney General's Office and the Office of the President, would be included in this category of deliberative documents protected by exemption 5. *See, e.g., Brinton* v. *Department of State, supra* (holding that opinions prepared by the Office of the Legal Adviser for the Secretary of State fell within the deliberative process privilege of exemption 5).

The courts have held, however, that "deliberative process" privilege does *not* protect documents which reflect final opinions, statements of reasons supplying the bases for decisions, or policies actually adopted, or documents that otherwise constitute the "working law" of an agency. *See NLRB* v. *Sears, supra*, 421 U.S. at 152–53; *Taxation With Representation, supra*, 646 F.2d at 678; *Coastal States, supra*, 617 F.2d at 866–68. The rationale underlying the "final opinion" exception to the deliberative process privilege is to prevent agencies from developing a body of "secret law" veiled by the exemption 5 privilege—the maintenance of which "would weigh heavily against the public interest." *Sterling Drug, Inc.* v. *FTC*, 450 F.2d 698, 715 (D.C. Cir. 1971). *See Brinton* v. *Department of State, supra*, 636 F.2d at 605. Thus, decision documents of the Office of the President, deliberative materials "incorporated" into those documents, and opinions of the Attorney General which have been "incorporated" into the President's final document, would be subject to disclosure under FOIA. *See EPA* v. *Mink*, 410 U.S. 73 (1973).[22]

---

[22] "Final opinions" of the Office of Legal Counsel or the Attorney General, which were written for the President and form part of the basis of the President's final action, but which have not been "incorporated" into the President's final decision document, would be protected from disclosure under exemption 5's privilege for attorney-client communications, as well as the deliberative process privileges. *See Brinton* v *Dep't of State, supra, Mead Data Central, supra*

If the "final opinions" from the Attorney General's Office are *not* of a legal advisory nature—or are otherwise ineligible for a claim of attorney-client privilege—an analysis must be made regarding the purpose of the opinion documents in issue If the opinion is a predecisional document—*i.e.*, the document presents the Attorney General's views on a particular matter which will be considered by the President in taking final executive action, or in the case where final executive action has already been taken but the Attorney General submits a document which "provide[s] guides for decisions of similar or analogous cases arising in the future"—the Supreme Court has stated that the document is exempted from FOIA's disclosure mandate as a deliberative document *NLRB* v *Sears, supra*, 421 U.S. at 152, n.19. If the Attorney General's "final opinion" is postdecisional, as are most final opinions—*i e.*,

Continued
493

Nor does the privilege extend to documents of a purely factual nature. In the case of documents of a mixed factual/deliberative nature, factual materials which can reasonably be severed from the deliberative or advisory segments of the document without compromising the confidential remainder of the document must be disclosed. *EPA* v. *Mink, supra,* 410 U.S. at 91. However, "factual segments [of advisory documents] are protected from disclosure as not being purely factual if the manner of selecting or presenting those facts would reveal the deliberate process, or if the facts are 'inextricably intertwined' with the policy-making process." *Ryan* v. *Department of Justice, supra,* 617 F.2d at 790 (footnotes omitted). *See Playboy Enterprises* v. *Department of Justice, supra.*[23]

## B. Attorney-Client Privilege

Exemption 5 of FOIA also embraces the common law evidentiary privilege for attorney-client communications. 5 U.S.C. § 552(b)(5); Fed. R. Civ. P. 26; Fed. R. Evid. 501.[24] *See NLRB* v. *Sears, supra,* 421 U.S. at 154; *Mead Data Central, supra.* The attorney-client privilege protects confidential disclosures of a client to his or her attorney, which were made in order to obtain legal assistance and not for the purpose of committing a crime or tort. 8 Wigmore, Evidence § 2290–2329

---

communications which "look[] back on and explain[]     a decision already reached or a policy already adopted"—the opinion would *not* be exempt from FOIA's disclosure mandate, since disclosure would pose "a negligible risk of denying to agency decisionmakers the uninhibited advice which is so important to agency decisions." *Id.*

In its companion case to *NLRB* v *Sears, supra, Renegotiation Bd.* v *Grumman Aircraft Engineering Corp.,* 421 U S 168, 184–85 (1975), the Court set forth the additional consideration of whether the author of the "final opinion" possesses decisional authority with reference to matters addressed in the opinion. Thus, if the subject of the Attorney General's opinion, or other Department of Justice communication, involves a matter over which the Office of the President has final decisional authority, the opinion necessarily is predecisional, and therefore exempt from disclosure, even if the opinion represents the "final" view or disposition of the Department of Justice on the matter. Of course, the final action taken by the Office of the President may incorporate the Attorney General's advisory opinion—in which case, it would lose its predecisional character and become subject to disclosure *See also Brinton* v. *Dep't of State, supra,* 636 F 2d at 605 (holding that legal opinions prepared by the Office of the Legal Adviser for the Secretary of State were properly withheld on the ground that the Legal Adviser's opinions were not "final opinions" as contemplated by the FOIA, inasmuch as the Legal Adviser "has no authority to make final decisions concerning United States policy    [,] [i]nstead, his role is to give advice to those in the State Department who do make the policy decisions.").

[23] The D.C. Circuit recently rejected the Department's claim of privilege for a 302-page document prepared by a task force of the Office of Professional Responsibility of the Department of Justice for the Attorney General. The document reported the results of an eight-month investigation into the circumstances surrounding the infiltration of an FBI informant into the Ku Klux Klan *Playboy Enterprises* v. *Dep't of Justice, supra,* 677 F.2d 931 Against the Department's claim that the entire report "reflect[ed] the 'choice, weighing and analysis of facts' by the task force and [was] therefore protected as a part of the deliberative process," 677 F.2d at 935, the court of appeals held that the report was, for the most part, not exempt from disclosure, and remanded to the district court for a determination of those limited portions of the report which were properly exempt, as containing conclusions, recommendations, or opinions and were severable from the factual portions of the document The court stated:

> We are not persuaded by the Department's argument. Anyone making a report must of necessity select the facts to be mentioned in it; but a report does not become a part of the deliberative process merely because it contains only those facts which the person making the report thinks material. If this were not so, every factual report would be protected as pārt of the deliberative process.

*Id.*

[24] The attorney-chent privilege is a common law evidentiary privilege which has been codified in Rule 501 of the Federal Rules of Evidence and Rule 26 of the Federal Rules of Civil Procedure for use in civil litigation and discovery. While the Rules are not applicable to congressional subpoenas, the interests implicated by the attorney-client privilege generally are subsumed under a claim of executive privilege when a dispute arises over documents between the Executive and Legislative Branches, and the considerations of separation of powers and effective performance of constitutional duties determine the validity of the claim of privilege

494

(McNaughton rev. 1961). *See Upjohn* v. *United States*, 449 U.S. 383 (1981); *Fisher* v. *United States*, 425 U.S. 391 (1976). Notwithstanding its overall purpose to protect the *client's* factual disclosures, the privilege has been extended by federal courts to include an attorney's communications to his or her client in order to prevent inadvertent disclosure, either directly or by implication, of information which the client had previously confided to the attorney, as well as to foster the attorney's ability to give sound and informed professional advice. *Coastal States, supra,* 617 F.2d at 862; *Mead Data Central, supra,* 566 F.2d at 254 n.25.

Like the executive and deliberative process privileges, the attorney-client privilege is designed to encourage full and frank discussions among the persons whose communications are protected and thereby to "promote [the] broader public interests in the observance of law and administration of justice." *Upjohn, supra,* 449 U.S. at 389. To this end, "[t]he privilege recognizes that sound legal advice or advocacy . . . depends upon the lawyer's being fully informed by the client." *Id. See also Mead Data Central, supra,* 566 F. 2d at 252 ("The opinion of even the finest attorney . . . is no better than the information which his client provides. In order to ensure that a client receives the best possible legal advice, based on a full and frank discussion with his attorney, the attorney-client privilege assures him that confidential communications to his attorney will not be disclosed without his consent."). *See generally* 2 J. Weinstein and M. Berger, *Weinstein's Evidence* ¶ 503 (1982).

Although the attorney-client privilege traditionally has been recognized in the context of private attorney-client relationships, the privilege also functions to protect communications between government attorneys and client agencies or departments, as evidenced by its inclusion in the FOIA, much as it operates to protect attorney-client communications in the private sector. *See Brinton* v. *Department of State, supra,* 636 F.2d at 603–04; *Mead Data Central, supra,* 566 F.2d at 252–55; *Jupiter Painting Contracting Co.* v. *United States,* 87 F.R.D. 593, 598 (E.D. Pa. 1980); *Falcone* v. *Internal Revenue Service,* 479 F. Supp. 985, 989–90 (E.D. Mich. 1979). *See also* Office of Legal Counsel, "Memorandum for Helen S. Lessin, Director, Federal Legal Council, re: OLC Policies Regarding Issuance and Release of Opinions" (Sept. 10, 1980).[25]

The Supreme Court's recent opinion in *Upjohn, supra,* analyzing the scope of the corporate "client" for purposes of the attorney-client privilege, is helpful to our consideration of the privilege in the context of the Attorney General and the Office of the President. In *Upjohn, supra,* the Court discarded the restrictive "control group" test[26] for determining which communications are within the scope of the privilege in a corporate setting, in favor of a broader scope of "client," more suited to the purposes of the privilege. The Court noted that the

---

[25] In addition. Government attorneys, no less than private attorneys, are bound by the ABA Code of Professional Responsibility's disciplinary rule DR 4–101(B), which provides that a lawyer shall not knowingly reveal a confidence or secret of his client unless the client consents to such disclosure.

[26] The control group test restricts the definition of "client" for purposes of the privilege to "upper-echelon management" officials "responsible for directing [the client corporation's] actions in response to legal advice " 449 U.S at 388, 391.

privilege was designed to protect both the giving of professional advice to those who are charged with the actual implementation of the client corporation's policies, as well as the communication of information to the attorney sufficiently specific to enable him or her to provide sound, practical, and informed legal advice. *Id.* at 390. These purposes were frustrated by the narrow scope of privileged communications recognized by the "control group" test.

While the *Upjohn* decision studiously avoided setting forth a precise formulation of the scope of the attorney-client privilege in the corporate or governmental setting, the Court was nonetheless insistent in its view that application of the privilege had to be determined in each case to serve the purposes of the privilege. In view of the criticism expressed in the *Upjohn* decision of the control group test, it is likely that, in most instances, the "client" in the context of communications between the President and the Attorney General, and their respective aides, would include a broad scope of White House advisers in the Office of the President. The "functional" analysis suggested by *Upjohn* focuses on whether the privilege would encourage the communication of relevant and helpful information from advisers most familiar with the matters on which legal assistance is sought, as well as whether the privilege is necessary to protect and encourage the communication of frank and candid advice to those responsible for executing the recommended courses of action. A corollary to this expanded concept of the "client," which reflects the realities of the governmental setting, is that the "attorney" whose communications are subject to the attorney-client privilege may, in fact, be *several* attorneys responsible for advising the "client" agency or division regarding the prudence and propriety of proposed courses of conduct. Thus, advice given by the various Assistant Attorneys General and their staffs may be subject to the privilege. *See, e.g., Brinton* v. *Department of State, supra.*[27]

Notwithstanding these notions of "attorney" and "client" which the Court has expanded to implement fully the purposes of the privilege, the actual operation of the privilege continues to be governed by the traditional guidelines and procedures.[28] As in the traditional attorney-client context, once the privilege has attached, only the client, in this case the President or some other high level official in the Office of the President who is responsible for receiving and acting on the legal advice, may waive it. Thus, for example, a FOIA request lodged with the Department of Justice for information communicated to the Office of the President by the Attorney General which is protected by the attorney-client privilege should not be honored unless the Office of the President consents to release of the information. *See* Office of Legal Counsel, "Memorandum for Helen S. Lessin," *supra. See generally* Harmon, Memorandum for Patricia M.

---

[27] Although the *Brinton* decision was ultimately decided on deliberative process grounds, the attorney-client privilege aspect of exemption 5 was discussed at length by the court.

[28] *See United States* v. *Anderson,* 34 F.R D. 518, 523 (D Colo. 1963), for application of the traditional attorney-client privilege formulation in the governmental context·

> [T]he documents are privileged insofar as they do not comment or report on information coming from persons outside the government or from public documents, or are summaries of conferences held with or in the presence of outsiders, and were produced with the idea of obtaining or receiving legal advice.

Wald, Assistant Attorney General, Office of Legislative Affairs, "Formulation of Policy on Disclosure of Information to Congress" at 8, 10 (July 19, 1977).

In addition, the person seeking to assert the privilege—either the client or the attorney on the client's behalf—must be able to demonstrate that the confidential disclosures "might not have been made absent the privilege," *Fisher* v. *United States, supra,* at 403, and that the underlying facts for which the privilege is claimed have *remained* confidential. *Mead Data Central, supra,* at 253. *See also Permian Corp.* v. *United States,* 665 F.2d 1214 (D.C. Cir. 1981); *Brinton* v. *Department of State, supra.*[29] Applying this rule to President-Attorney General communications, the circulation of advisory documents outside the operative circle of officials responsible for giving or receiving advice in the Office of the President or the Department of Justice, or, the reporting of factual information acquired from persons or sources outside the privileged relationship, would constitute a waiver, whether express or implied, of the privilege with respect to those documents and would subject them to disclosure, unless exempt from the Freedom of Information Act pursuant to some other exemption. *See Permian Corp.* v. *United States, supra;*[30] *Brinton* v. *Department of State, supra.* Advisory documents from the Attorney General which have been turned over to congressional committees are presumed to be no longer confidential and may not be the basis of a claim of attorney-client privilege. *See generally* Harmon, "Formulation of Policy on Disclosure of Information to Congress," *supra.*[31] *See also Permian Corp.* v. *United States, supra,* at 1220–22. However, these same documents may be subject to the deliberative process privilege under exemption 5.[32]

---

[29] The requirement that the confidential disclosures for which the privilege is sought have remained confidential does not preclude the privilege's proper attachment to communications which have been circulated in a limited fashion beyond the attorney and the person within the group requesting legal advice. *See Upjohn* v *United States, supra,* at 395; *Coastal States, supra,* at 863; *Mead Data Central, supra,* at 253 n.24. This broader scope of the confidentiality requirement is particularly appropriate in the corporate and governmental contexts. *See discussion, infra*

[30] In *Permian Corp., supra,* the D.C. Circuit held that the voluntary disclosure of confidential materials to a third party outside the privileged relationship, in this case, the SEC, constituted a waiver of the privilege with respect to those documents, notwithstanding the SEC's agreement to protect the documents from further disclosure. Thus, the court rejected the rule of "limited waiver," followed by the Eighth Circuit in *Diversified Industries, Inc.* v. *Meredith,* 572 F 2d 596 (1977) *(en banc),* and concluded that the privilege could no longer be invoked to protect the documents from being disclosed by the SEC to another government agency·

> The Eighth Circuit's "limited waiver" rule has little to do with [the] confidential link between the client and his legal advisor Voluntary cooperation with government investigations may be a laudable activity, but it is hard to understand how such conduct improves the attorney-client relationship If the client feels the need to keep his communications with his attorney confidential, he is free to do so under the traditional rule by consistently asserting the privilege, even when the discovery request comes from a "friendly" agency.
>
> \*  \*  \*  \*  \*
>
> [T]he attorney-client privilege should be available only at the traditional price. a litigant who wishes to assert confidentiality must maintain genuine confidentiality

665 F 2d at 1220–21, 1222 (footnote omitted).

[31] Former Assistant Attorney General Harmon suggested that even the "limited disclosure" involved in disclosing privileged materials to an executive session of Congress, or in a nonpublic administrative hearing, "would appear to undermine the theoretical predicate of the privilege," as applied in the civil discovery context. "The purpose of a privilege is to protect confidential communications necessary to promote certain relationships, once this confidentiality is breached, the rationale for granting the privilege no longer applies " "Formulation of Policy on Disclosure of Information to Congress," *supra,* at 5 (citations omitted)

[32] There is an additional privilege available under exemption 5 which may be invoked, when appropriate, to

Continued

497

## III. The "Governmental" Evidentiary Privileges—and Their Freedom of Information Act Counterparts

The so-called "governmental" evidentiary privileges are common law privileges, now incorporated into the Federal Rules of Civil Procedure and the Federal Rules of Evidence, which have traditionally been available exclusively to the government as a litigant. Daniel, Assistant Attorney General, Civil Division, "Memorandum to All Civil Division Attorneys re: Asserting Claims of Official Government Privilege in Litigation" (Nov. 1980). *See generally McClelland* v. *Andrus, supra,* at 1286, n.53, quoting *Association for Women in Science* v. *Califano,* 566 F.2d 339 (D.C. Cir. 1977). These privileges—the informant's privilege, the law enforcement investigatory files privilege,[33] and the privilege for confidential information on required reports[34]—supplement the deliberative process, attorney-client and work-product privileges discussed above which are available to governmental as well as private parties in the civil litigation and discovery contexts. *See* Fed. R. Civ. P. 26; Fed. R. Evid. 501. These "governmental" privileges are necessary to protect the ability of the Executive Branch to discharge its duties under the Constitution and the laws of the United States, but because their assertion in litigation does not raise the problems of a constitutional conflict with a coequal branch, these privileges may be invoked by the head of the executive department in possession or control of the requested documents, or his or her delegate.[35] *See Association for Women in Science* v. *Califano, supra. See also McClelland* v. *Andrus, supra;* Daniel, "Asserting Claims of Official Governmental Privilege in Litigation" (Nov. 1980). These privileges also have

---

protect communications from the Office of the Attorney General to the Office of the President—the work-product privilege The work-product privilege under exemption 5 of the FOIA protects documents prepared in contemplation of litigation which reflect the "mental processes" of attorneys. The work-product privilege is distinct from the attorney-client privilege in that "it provides a working attorney with a 'zone of privacy' within which to think, plan, weigh facts and evidence, candidly evaluate a client's case, and prepare legal theories " *Coastal States, supra,* at 864. While the attorney-client privilege is designed to protect the client's interest in confidentiality, the purpose of the work-product privilege is to protect "the adversary trial process itself." *Id.*

Because it is limited to documents prepared in contemplation of litigation, the work-product privilege is the least invoked of the exemption 5 privileges in the context of President-Attorney General communications The broad advisory role that the Attorney General plays vis-à-vis the President, together with the President's general lack of involvement in litigation strategies, makes their communications far more suited to the deliberative process and attorney-client privileges as a basis for nondisclosure in litigation or under FOIA.

[33] The investigatory files privilege—which frequently encompasses information which might reveal the identity or statements of informants—protects interests which may be asserted under a claim of executive privilege also, if the interests are sufficiently strong in a particular case to implicate constitutional concerns. *See* 40 Op. Att'y Gen. 45. *See also* Office of Legal Counsel, "Executive Privilege in Litigation for Investigative Files" (September 18, 1981); Harmon, "Memorandum to All Heads of Offices, Divisions, Bureaus, and Boards of the Department of Justice," (May 23, 1977), Rehnquist Testimony, *supra.* However, because these interests rarely impinge on the performance of constitutional functions of the Executive Branch to the same degree as the "state secrets" or deliberative process components of the privilege, the privilege is generally asserted simply as an evidentiary privilege in litigation.

[34] The privilege for confidential information on required government reports is similar to the informant's privilege, *see* discussion at 31, *infra,* in that it protects information solicited by the government for its purposes on a promise of confidentiality. This privilege, like its FOIA-exemption 6 counterpart, protects accident reports, employment history reports, financial disclosures, conflict-of-interest reports, and other information, the disclosure of which would constitute a "clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). *See Dep't of State* v *Washington Post Co.,* 456 U S. 595 (1982). *Dep't of the Air Force* v. *Rose,* 425 U.S. 352 (1976); *Ass'n for Women in Science, supra.* Of the privileges discussed in this memorandum, this is the least likely privilege to be invoked in the context of President-Attorney General communications.

[35] *See generally* n.5, *supra.*

analogues in the Freedom of Information Act under exemptions 6 and 7, 5 U.S.C. §§ 552(b)(6),(7), to shield documents of the same general type from disclosure to members of the public. As noted in the foregoing discussion of the evidentiary privileges incorporated into exemption 5 of the FOIA, the court must strike a balance between "the public concern in revelations facilitating the just resolution of legal disputes [on the one hand,] and, on the other, occasional but compelling needs for confidentiality," *McClelland* v. *Andrus, supra* at 1287, n.55, in deciding claims of privilege in the litigation context.

## A. Informant's Privilege

The informant's privilege permits the government to withhold the identity of persons who furnish information concerning violations of the law, or otherwise render assistance, to officers charged with law enforcement responsibilities. *See* 8 C. Wright & A. Miller, Federal Practice & Procedure, § 2019 at 155 (1970); *Roviaro* v. *United States,* 353 U.S. 53 (1957); *Black* v. *Sheraton Corp. of America,* 47 F.R.D. 263 (D.D.C. 1969), *aff'd* 564 F.2d 550 (D.C. Cir. 1977). The informant's privilege recognizes that prospective informants usually condition their cooperation with law enforcement officers on an assurance of anonymity in order to protect against physical harm or other undesirable consequences to themselves and their families which would very likely result as a consequence of disclosure. *United States* v. *Tucker,* 380 F.2d 206, 213 (2d Cir. 1967). Although this privilege protects only the identity of the informant, information provided by the informant may also be shielded under this privilege if its disclosure would reveal the informer's identity. *Rovario* v. *United States, supra,* at 60. The informant's privilege, like the other privileges discussed above, is qualified; therefore, the government must show that its interest in effective law enforcement outweighs the litigant's need for the information. *See Rovario* v. *United States, supra; In re Attorney General of United States,* 596 F.2d 58 (2d Cir. 1979); 2 J. Weinstein and M. Berger, Weinstein's Evidence ¶ 510[02] at 510–18 (1982).

## B. Law Enforcement Investigatory Files Privilege

Like the informant's privilege, the privilege for law enforcement investigatory files is necessary to protect against the harm that would flow from public disclosure of information contained in the files and to facilitate the government's law enforcement process. *See Black* v. *United States,* 564 F.2d 531 (D.C. Cir. 1977); *Brown* v. *Thompson,* 430 F.2d 1214 (5th Cir. 1970). Disclosure of open investigatory files[36] would undercut the government's efforts to prosecute criminals by disclosing investigative techniques, forewarning suspects under inves-

---

[36] As is apparent from the reasons underlying the privilege, the law enforcement investigatory files privilege does not apply to files pertaining to investigations which have been closed, although information protected by another privilege, *e.g.,* the informant's privilege, would continue to be shielded. *See* 2 Weinstein's Evidence ¶ 509(07) at 509–52–58 (1982). *Cf.* Supreme Court's recent discussion of FOIA exemption 7 in *FBI* v. *Abramson,* 456 U.S. 615 (1982)

tigation, deterring witnesses from coming forward, and prematurely revealing facts supporting the government's case.[37] The privilege for law enforcement investigatory files is a qualified privilege, and may be overcome by a strong showing of need or interest in disclosure of the information. *See Black v. United States, supra.*

## C. FOIA Exemption 7

Exemption 7 of the Freedom of Information Act incorporates these privileges for law enforcement records to protect the information contained therein from compulsory disclosure to members of the public. Exemption 7 exempts from the general disclosure mandate of the FOIA those matters which are

> investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with enforcement proceedings, (B) deprive a person of a right to a fair trial or an impartial adjudication, (C) constitute an unwarranted invasion of personal privacy, (D) disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source, (E) disclose investigative techniques and procedures, or (F) endanger the life or physical safety of law enforcement personnel[.]

5 U.S.C. § 552(b)(7). The subparts of § 552(b)(7) make clear that the interests protected therein are roughly analogous to those protected by the "governmental" privileges in litigation for informant's identity and law enforcement investigatory files. *See generally FBI v. Abramson, supra; NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214 (1978); *Lesar v. Department of Justice,* 636 F.2d 472 (D.C. Cir. 1980), *Church of Scientology of Calif. v. Department of Justice,* 612 F.2d 417 (9th Cir. 1979).

## IV. Conclusion

The privileges available to protect the confidentiality of the Attorney General's communications with the Office of the President can be roughly categorized into three classes, depending upon the nature of the communications for which the privilege is asserted, the interests which are sought to be protected by the claim of privilege, and the persons against whom the claim is made. This memorandum represents an effort by this Office to provide the Attorney General with a general outline of the privileges available to him to protect his confidential communica-

---

[37] *See also* former Attorney General Jackson's opinion at 40 Op. Att'y Gen 45 (1941), concluding that premature disclosure of law enforcement investigative reports to Congress or the public could prejudice the rights of prospective defendants whose investigations are the subject of the reports.

tions and working papers from compulsory disclosure when he believes that disclosure would be against the interests of the Department, the President, or the broader "public," and to provide guidelines for the assertion of those privileges. While the foregoing discussion should prove helpful in providing a framework for analysis of potential claims of privilege, we would caution that the applicability of any privilege to a given set of circumstances will almost always involve a judgment of competing values. While the Attorney General or the client must decide initially whether to assert the privilege, the task of resolving conflicts arising out of such competing values, in the final analysis, is one that is reserved to the courts.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*